**In re Condemnation Proceedings for the WILMARTH LINE OF the C U PROJECT.**

**No. 50911.**

Supreme Court of Minnesota.

Nov. 7, 1980.

Kenneth E. Tilsen and David Kramer, St. Paul, for appellant.

LeVander, Gillen, Miller & Magnuson, South St. Paul, for United Power Assn.

LeFevere, Lefler, Pearson, O'Brien & Drawz, Minneapolis, for Co–op. Power.

Warren Spannaus, Atty. Gen., Dwight S. Wagenius, Sp. Asst. Atty. Gen., St. Paul, for Intervenor Minnesota Energy Agency.

Minnesota Public Interest Research Group, Ann Gilford, Minneapolis, for amicus curiae.

TODD, Justice.

This matter arises out of eminent domain proceedings brought by the respondents Cooperative Power Association (CPA) and United Power Association (UPA) and was previously before this court. *See Co–op. Power Ass'n v. Eaton,* 284 N.W.2d 395 (Minn. 1979).

In that case, we found that appellant landowners had not been given an adequate opportunity to present evidence concerning the public necessity for the condemnation proceedings. We found that additional evidence must be taken relative to the adequacy of notice originally given in the certificate of need proceedings for the C U Project and consolidated all cases in various counties relating to proposed condemnations in the area of the Wilmarth segment of the proposed transmission system. We designated certain issues to be determined by the trial court and appointed a three–judge panel to hear the evidence and decide the questions presented. The panel found that the notice given relative to the certificate of need proceedings was adequate, that

appellants' offer of proof did not present sufficient evidence which could materially affect the original decision of the Minnesota Environmental Agency (MEA) to issue the certificate of need, and found that appellants had not been guilty of laches even though they had not raised the notice issue until the commencement of these condemnation proceedings.

The appellant landowners appealed from the first two determinations of the trial panel and respondents filed a notice of review on the issue of laches. We conclude that the determination of the trial panel that there was adequate notice of the need proceedings is incorrect and remand with instructions.

This case is a culmination of a long and bitter controversy over the construction of an electrical generating plant at Underwood, North Dakota, known as the Coal Creek Station, and over the transmission system used in delivering the output of that plant to CPA and UPA facilities. The initial case before this court was *No Power Line v. Minn. Environmental Quality*, 262 N.W.2d 312 (Minn. 1977). That case involved the corridor and siting proceedings in the segment of the transmission system from the Minnesota border to the conversion station at Delano, Minnesota, known as the Dickinson Substation. In that original litigation, we stated:

> In our judgment the need for additional electric power was so clear that the order in which the hearings were held was of no practical significance. This belief is confirmed by the fact that during the course of oral argument before this court none of the appellants seriously argued that the electrical energy to be supplied by this project was unnecessary.

*Id.* at 326. The concurring opinion in that case points out that the litigants and the state agencies assumed that there was a need for the facilities which were the subject of the action, and that, therefore, the need question was not litigated and was not before us. *Id.* at 332. Thus, it is apparent that this court has never directly passed upon the issue raised by the appellants;

namely, was there proper notice given at the time of the original certificate of need hearings?

In our previous opinions, we have recited in detail the factual background of the present litigation. Those facts will not be repeated herein except as they relate to the issues presented. We do note, however, that the practicalities of the situation dictate that we focus on need only as it affects a third AC line, since the transmission system for which the original certificate of need was issued is now in place and operating except for the Wilmarth segment.

The history of the statutes applicable to this case is helpful in evaluating the issues presented. Prior to 1973, there were no statewide statutory requirements concerning electrical generating or distribution facilities. Electrical utilities made determinations based on their own interests and were granted the power of condemnation to effectuate those interests. The adoption of the Minnesota Environmental Protection Act on May 19, 1973, and subsequent enactments thereafter, have been discussed in detail in our *No Power Line* case. *See id.* at 323–24.

An examination of these statutes discloses a legislative attempt to systematically evaluate electrical energy needs and other energy needs within this state and to adopt an orderly system of fulfilling those needs in a manner that is compatible with environmental and resource considerations.

The power companies involved herein filed an application for a certificate of need on October 6, 1975. At that time, corridor proceedings on the segment of the transmission system from the Minnesota border to the Dickinson Substation were in progress. These corridor proceedings were initiated prior to the need proceedings, in that instance, because the statutory certificate of need requirement was not passed until 1974 and did require the promulgation of regulations until September 15, 1975. *See* Minn.Stat. § 116H.13 (1978 & Supp. 1979). The statute contemplates that certificate of need hearings are of a general nature and deal with broad determinations

of public energy needs, the available resources for satisfying those needs, and the desirability of or necessity for additional generating or transmission systems. Minn. Stat. § 116H.13, subd. 3 (Supp. 1979); *see* 6 MCAR § 2.0611(C). These proceedings may or may not be site specific, but the determination of need is not dependent on or related to specific sites. Site specific determinations are relegated to route proceedings since corridor–type proceedings have been statutorily abandoned. *See* Minn.Stat. § 116C.57 (1978).

The determination regarding need must be "facility specific," however. That is, the utility must satisfy the Energy Agency of the need for any specifically proposed facility which qualifies as a "large energy facility" under Minn.Stat. § 116H.02, subd. 5 (Supp. 1979).[1] That conclusion is compelled by the language of the certificate of need legislation and the Energy Agency regulations. In assessing need for a proposed facility, the director of the Energy Agency must consider, among other things, the "relationship of *the proposed facility* to overall state energy needs"; "[p]romotional activities which may have given rise to the demand for *this facility*"; "[s]ocially beneficial uses of the output of *this facility*, including its uses to protect or enhance environmental quality"; and the "effects of *the facility* in inducing future development." Minn.Stat. § 116H.13, subd. 3(3), (4), (5), (6) (Supp. 1979) (emphasis added). Likewise, Energy Agency regulations require the director, in passing on a utility's application for a need certificate, to consider "the appropriateness of the size, type and timing of the proposed facility * * *." 6 MCAR § 2.0611(C)(2)(a) (emphasis added). The Wilmarth Line constitutes a large energy facility under the statute, being 76 miles in length and having a capacity of 345 kilovolts. The statutory language indicates

that the legislature intended that the Energy Agency, in determining need, consider the need for the specific proposed facility.

The route determination proceedings were commenced in this case in February 1976. Appellants have not challenged those route proceedings, nor has anyone appealed from those proceedings.

The legislative scheme contemplates that, subsequent to the route proceedings, there will be condemnation proceedings as have been commenced here to effectuate the taking of individual properties.

It appears from this statutory procedure that the trial court, in such condemnation proceedings, is substantially limited in its determination of public necessity, a finding which is a statutory prerequisite to the granting of a petition for condemnation. *See* Minn.Stat. § 117.075 (1978). Absent special circumstances, it may be assumed that the trial court will find public necessity to exist when there has been a finding of need by the appropriate state agency, except as this question may relate to individual parcels of property.

At the condemnation proceedings involved herein, appellants challenged the validity of the certificate of need on the ground that proper notice of the need proceedings had not been given in violation of statutory, regulatory, and due process requirements.

Minn.Stat. § 116H.13, subd. 4 (1974), requires that, in certificate of need proceedings, the MEA director shall hold at least one public hearing pursuant to Minn.Stat. ch. 15 (1974). Minn.Stat. § 15.0418 (1974) provides in part: "In any contested case *all parties* shall be afforded an opportunity for hearing after reasonable notice." (Emphasis added.) Chapter 15 does not contain a definition of "parties." However, the pro-

---

1. Minn.Stat. § 116H.13, subd. 3 (Supp. 1979), provides that "[n]o proposed large energy facility shall be certified for construction unless the application has justified its need."

   Minn.Stat. § 116H.02, subd. 5(b) (Supp. 1979), provides:

   "Large energy facility" means:

       *    *    *    *    *    *

   Any high voltage transmission line with a capacity of 200 kilovolts or more and with more than 50 miles of its length in Minnesota; or, any high voltage transmission line with a capacity of 300 kilovolts or more with more than 25 miles of its length in Minnesota.

cedural rules of the MEA do contain such a definition as follows:

1) the applicant; and

2) any person who has properly intervened under EA 506.

Minn.Reg. EA 507(a).

The landowners claim that they fall within this definition of "parties" and, therefore, are entitled to reasonable notice arguing that "parties" include all those who have the *right* of intervention in certificate of need hearings. Minn.Reg. EA 506(d) provides that intervention shall be granted to those who "may be materially affected by the outcome of the proceedings." There is no question that these plaintiffs may be so affected.

The MEA rules also contain a notice provision. Minn.Reg. EA 504(b) requires that the notice of application and hearing for the certificate of need shall be published in newspapers of general circulation throughout the state. The obligation and responsibility for carrying out the statutory and regulatory mandates regarding published notice lie with the agency and the hearing officer and not with the applicants.

On December 1, 1975, a prehearing conference was held by the hearing examiner regarding the certificate of need proceedings. Present were representatives of the attorney general's office, a representative of the Environmental Protection Agency, counsel for UPA and CPA, and counsel for opponents of the northern segment of the transmission system. At that hearing, the referee stated that he was directing the agency to send a copy of the order for hearing to anyone who had indicated to the agency that they were interested in the proceedings and also asked that the director of the certificate of need program put out a press release in the Alexandria area and any other area which might contain a significant number of interested persons. Counsel for the utilities pointed out that a press release was not sufficient but that notice must also be published in at least one newspaper of general circulation for each county in the designated corridor. The referee indicated his reluctance to go to the expense of putting these notices in newspapers of general circulation since there were about 12 counties involved. Counsel for the utilities at that point expressed his concern about the integrity of the proceedings and that all statutory and regulatory requirements be met. It was also indicated that notices of this hearing had been sent to hundreds of people, including state agencies and public libraries, along the proposed routes. The evidence discloses that copies of the notice were furnished to libraries within the Wilmarth section of the proposed transmission system, but the record is clear that there was no published notice in any of the county newspapers in the counties involved in the Wilmarth section. There was publication only in county newspapers located in the northern section of the transmission system.

The panel found that the publications in the northern section satisfied the regulatory notice requirement because the publications were contained in newspapers of general circulation. We decline to accept that determination.

The regulation provides for publication *throughout* the state. It seems fairly clear that the regulation contemplates publication of notice be given the widest possible dissemination. In this state, there are newspapers in Minneapolis and St. Paul that have general circulation throughout the state. We see no reason why notice of the certificate of need hearings was not published in these papers. The legislative purpose would be effected if such notice were published in newspapers in counties where any proposed transmission system may be installed if the certificate of need is issued. The cost of such notice is not adequate reason to refrain from publishing it. The legislative purpose in establishing a certificate of need proceedings was to encourage the greatest public participation. While the site for the transmission line might not be considered at the certificate of need hearing, it would be beneficial to inform persons that they may be affected by the proceedings. Likewise, the general public has an interest in any change in the

electrical power distribution system within the confines of this state.

The trial court also made a determination that the appellants in this matter had actual notice of the proceedings. There is evidence in the record that would support such a conclusion. Route designation proceedings were commenced in February 1976. Hearings were held in all counties on the Wilmarth section of the line during this period. Attendance was heavy at each hearing, although there was no specific identification of those in attendance except in the case of individuals who spoke. The issue of notice of certificate of need proceedings was raised on numerous occasions at these route selection proceedings by various people and, in particular, by Dr. Wendell G. Bradley who appeared in opposition to the route designation hearings and expressed on one occasion that he was a representative of an informal association of landowners opposing the proceedings. All of these hearings occurred prior to April 4, 1976, the date of the issuance of the certificate of need by the agency. The route hearings were extensively covered in newspaper articles in the counties affected by the Wilmarth section of the transmission system. The issuance of the certificate of need was reported by the newspapers in this area. There was no attempt to reopen the proceedings or to appeal within the time permitted from the issuance of the certificate of need by any of the present parties to this proceeding or by anyone. However, in consideration of the legislative importance attached to public input in all stages of these proceedings, we decline to rest our decision on the panel's determination of actual notice, since it was based on the indirect concept of constructive notice. We conclude that there was inadequate notice of the certificate of need hearing.

Before disturbing in any way the need certification granted by the Energy Agency, however, we set out in *Eaton* the requirement that the landowners make a "prima facie" showing by offer of proof of material evidence which could reasonably result in a different decision by the MEA. *Co–op. Power Ass'n v. Eaton*, 284 N.W.2d at 398–99. In our view, the landowners have made such a showing.

We remand the matter to the district court with instructions to require the MEA to conduct another need hearing following proper publication of notice. We do so because of our concern for the public's right to be involved in the making of energy decisions and particularly the rights of landowners whose property could be affected by such determinations. As we have indicated, the trial court at the time of the condemnation proceedings will normally have a very limited role in determining the question of public necessity for the taking. Thus, it is important that landowners be given an opportunity to present their evidence on such a vital issue, and the only reasonable opportunity to do so occurs at the need hearing.

In remanding this matter, we make the following determinations as to what issues are to be considered at the reconvened need hearings:

1. The first issue to be determined is whether or not there is a need for 1,000 megawatts of power.[2]

2. The evidence relating to need shall be based on evidence existing at the time of the reconvened hearing. We think it illogical to reconstruct the evidence and projections presented at the former hearing.[3]

3. The present record establishes the need for three AC lines from the Dickinson Substation if the need for 1,000 megawatts

2. The 1,000 megawatts of power refer to generated power and not delivered power. As the record discloses, there is a diminution for various technical reasons during the transmission of the power. Evidence of delivered power is irrelevant and immaterial.

3. The court contemplates that this initial hearing would be expeditiously convened and limited in its consideration. The present record may be used and reconsidered and only facts existing at the time of the hearing which change the facts upon which the original certificate of need was proposed and allowed need be considered.

of power is established. Thus, evidence on this issue should not be reconsidered upon the question of the need for 1,000 megawatts of power.[4]

4. The designation of the 75–mile Wilmarth line is a route selection question and evidence as to the appropriateness of this selection is not to be considered at a need hearing.

5. Evidence as to the effect of construction on individual landowners' parcels is not to be considered at a need hearing.

6. If the MEA shall decide that less than 1,000 megawatts of power are needed, then, but not otherwise, the hearing should be continued to determine the necessity of a third AC line in order to permit the system to function considering the reduced need.

Having concluded that the matter must be remanded, we do not reach the other issues raised.

Reversed and remanded with instructions.

The original opinion filed October 10, 1980, is hereby withdrawn.

YETKA, Justice (concurring specially).

I concur with the opinion in all respects except that I would allow appellants to offer evidence that neither the Wilmarth Line nor any other third alternating current line is necessary in order to permit the system to function even if there is a proven need for 1,000 megawatts of power. The majority opinion already permits evidence as to need for the 1,000 megawatts to be used *as of the time of the hearing.* Why not allow evidence at that same time to be offered as to the need for a third line? Time may change need and it may change technology. Why not avoid the possibility of possible additional litigation? Why not see that the agency delves into both questions so it can decide both questions at once?

PETERSON, J., took no part in the consideration or decision of this case.

4. The question of need is a system-wide question and area needs such as the Wilmarth area are irrelevant and inappropriate for considera-

tion except as they relate to and are a part of the basis of that system-wide need.