The STATE of Minnesota by CITIZENS AGAINST POWER PLANT POLLUTION, INC. (CAPPP, INC.), etc., et al., Appellants,

v.

MINNESOTA ENVIRONMENTAL QUALITY BOARD of the State of Minnesota et al., Respondents,

and

Northern States Power Company, Intervenor, Respondent.

No. 50935.

Supreme Court of Minnesota.

May 15, 1981.

Broeker, Hartfeldt, Hedges & Grant, Will Hartfeldt, and Becky A. Comstock, Minneapolis, for appellants.

Warren Spannaus, Atty. Gen., and Douglas C. Blomgren, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Environmental Quality Board of the State of Minnesota.

Joseph D. Bizzano, Jr., Popham, Haik, Schnobrich, Kaufman & Doty and Raymond A. Haik, Minneapolis, for Northern States Power Company.

TODD, Justice.

Plaintiffs, Citizens Against Power Plant Pollution, Inc. (CAPPP), a Minnesota nonprofit corporation composed of farmers and other residents of Sherburne County, and its president, Malcolm Olson, brought this action against the Minnesota Environmental Quality Board (MEQB), seeking declaratory and equitable relief under the Minnesota Environmental Rights Act (MERA), Minn.Stat. §§ 116B.01–.13 (1978). Plaintiffs challenged the MEQB's November 1975 grant to defendant-intervenor Northern States Power Company (NSP) of a Certificate of Site Compatibility, pursuant to the Power Plant Siting Act (PPSA), Minn. Stat. §§ 116C.51–.69 (1978) (amended 1980), for two proposed large electric power generating plants of 800 megawatts each (Sherco 3 and Sherco 4) at a site in Sherburne County where two other large electric power generating plants (Sherco 1 and Sherco 2) were already in operation.

Plaintiffs alleged, as their first cause of action, that the Certificate of Site Compatibility was invalid because it was issued before NSP had received a Certificate of Need (CON) for Sherco 3 and Sherco 4 from the Minnesota Energy Agency (MEA) pursuant to the Minnesota Energy Agency Act, Minn.Stat. § 116H.13 (1978 & Supp.1979) (amended 1980), or, alternatively, that the Certificate of Site Compatibility became invalid when, in March 1978, the MEA voided the CON as to Sherco 4 and as to the timing of Sherco 3.

As to their second cause of action, plaintiffs alleged that the Certificate of Site Compatibility was invalid because the MEQB had failed to consider the environmental and health effects of siting four power plants at the Sherco site, particularly in light of the threat of an accident at the nuclear power plant operating nearby.

Third, plaintiffs alleged that the Certificate of Site Compatibility was invalid because the MEQB had failed to seek and evaluate feasible and prudent alternatives to the Sherco site. Additionally, plaintiffs

urged before the district court that the MEQB was without jurisdiction to grant NSP the Certificate of Site Compatibility for the Sherco site because the Minnesota Legislature had designated a site at Henderson, in Sibley County, for NSP's new generating facilities.

In a comprehensive order and memorandum, the Ramsey County District Court granted summary judgment in favor of defendants on plaintiffs' first cause of action and on the challenge to the MEQB's jurisdiction, dismissed the allegations regarding the nuclear hazard as outside the scope of MERA but otherwise remitted the second cause of action to the MEQB for further consideration of the environmental and health effects of Sherco 3, and, finally, dismissed plaintiffs' third cause of action on the basis of laches. Plaintiffs appeal from all of the district court's rulings except that remitting the second cause of action. We affirm.

The appeal raises the following issues for our consideration: (1) whether the MEQB was without jurisdiction to grant NSP a Certificate of Site Compatibility for the Sherco site because the legislature exclusively designated a site at Henderson, Minnesota, for this particular electric generating facility; (2) whether plaintiffs' allegation that the siting of a coal-fired power plant near a nuclear generating facility could have an adverse environmental and reliability impact states a claim under MERA; (3) whether the MEQB erred in refusing to reconsider the Certificate of Site Compatibility for Sherco 3; and (4) whether plaintiffs' claim that the MEQB failed to consider alternatives to the Sherco site is barred by laches.

These issues are difficult and complex. We recognize, as the trial court did, the hard task of the MEA and the MEQB in balancing, on the one hand, the public need for electric power and, on the other hand, the risks to human life, health, and environment generally from power plants and power lines. To understand the issues and to decide them as best we can, it is necessary to see the case in its factual, chronological setting extending over eight years.

*Facts and Procedural History*

On April 5, 1972, Governor Wendell Anderson, by executive order, created the Governor's Environmental Quality Council (GEQC), composed of the Governor, the Directors of the Minnesota Pollution Control Agency (MPCA) and the State Planning Agency, and the Commissioners of Natural Resources and Highways. Eight days later, NSP sought the GEQC's recommendation regarding the site for a 1,600-megawatt coal-fired electric generating facility to be operating by 1979–80. In May of 1972, the GEQC created a 23-member power plant siting task force and directed it to examine the need for the plant and to make a recommendation regarding siting.

The task force considered 15 potential sites, seven of which were identified in a study prepared by NSP for a private consulting firm and provided by the task force. After public meetings in the site areas and site tours by task force members, the task force issued its report in December 1972, recommending as its first choice a site in Sherburne County, Minnesota, where a 1,360-megawatt NSP facility in two plants, Sherco 1 and 2, was being constructed. The task force recommended that its second choice, a site at Henderson in Sibley County, Minnesota, be utilized if the GEQC established that the Sherburne County site would have substantially greater air quality impact, and recommended as its third choice a site at Jordan in Carver County, Minnesota.

In January 1973, the GEQC met and considered the task force report, a Minnesota State Planning Agency report indicating that the Sherburne County site would have greater air quality impact than the Henderson site, and a letter from the MPCA, also expressing concern about the effect that two additional plants at the Sherco site might have on ambient air quality standards. The GEQC voted four-to-one to recommend the Henderson site for construction of NSP's next electric generating plant, with the Jordan site as a second

choice. The GEQC sent its recommendations to NSP by letter of February 1, 1973. On February 6, 1973, NSP indicated that it would begin preparing design and engineering studies to construct its facility at the Henderson site.

On May 23, 1973, the legislature enacted the PPSA, which gave the newly created Minnesota Environmental Quality Council [1] authority to "provide for power plant site * * * selection." Act of May 23, 1973, ch. 591, § 3, 1973 Minn.Laws, 1343, 1344 (current version at Minn.Stat. § 116C.53, subd. 2 (1978)). The PPSA provides that any new electric generating facility may be constructed only on a site designated by the MEQB in accordance with criteria [2] which the act required the MEQB to develop with public participation. Minn.Stat. §§ 116-C.53, .55, .57 (1978). No later than one year after a utility requests designation of a site, the MEQB must designate such a site and issue a "Certificate of Site Compatibility," which constitutes the sole site approval a utility must obtain. Id. §§ 116C.57, .61. The time for designation "may be extended for six months" by the MEQB "for just cause." Id. § 116C.57, sub. 1. The legislature adopted the following "savings clause" as part of the PPSA:

The provisions of this act shall not apply to the site for the large electric power generating plant evaluated and recommended by the governor's environmental quality council prior to the date of enactment, and also to high voltage transmission lines, the construction of which will commence prior to July 1, 1974; provided, however, that within 90 days following the date of enactment, the affected utility shall file with the council a written statement identifying such transmission lines, their planned location, and the estimated date for commencement of construction.

Act of May 23, 1973, ch. 591, § 17, 1973 Minn.Laws 1343, 1351 (current version at Minn.Stat. § 116C.67 (1978)). The PPSA was adopted, as noted, in May 1973; regulations establishing procedures for siting of new plants were adopted August 2, 1974.

On March 28, 1974, the legislature enacted the Minnesota Energy Agency Act, which created the MEA and gave that body authority to make decisions regarding the need for new power plants in the state pursuant to criteria which the MEA was required to adopt by July 1, 1976. See Act of Mar. 28, 1974, ch. 307, 1974 Minn.Laws 494 (codified at Minn.Stat. §§ 116H.001–.15 (1978) (amended 1979, 1980). Later that year, on November 1, 1974, NSP, having determined that the Henderson site was less desirable than the Sherburne County

1. In 1975, the legislature changed the name of this agency to the Minnesota Environmental Quality Board. We will refer to it as MEQB. As established by the legislature, the MEQB membership consists of the officials who were members of the Governor's Environmental Quality Council and a number of others:

The board shall include as permanent members the director of the state planning agency, the director of the pollution control agency, the commissioner of natural resources, the commissioner of agriculture, the commissioner of health, the commissioner of transportation, the director of the Minnesota energy agency, a representative of the governor's office designated by the governor, the chairman of the citizens advisory committee, and three other members of the citizens advisory committee as designated by the governor. The names of the four members of the citizens advisory committee designated to serve on the board shall be submitted to the senate for its advice and consent. Upon the expiration of the citizens advisory committee the governor shall appoint four members from the general public to the board, subject to the advice and consent of the senate. Minn.Stat. § 116C.03, subd. 2 (1978).

2. The PPSA provides that in developing criteria and considering sites, the MEQB shall "be guided by" evaluation of research relating to the effects of power plants on land, water, and air resources, public health and welfare, vegetation, animals, materials and aesthetic values, and new or improved methods for minimizing adverse impacts; evaluation of new energy technologies and systems to minimize adverse impacts; evaluation of possible beneficial uses of waste energy; analysis of the economic impact of proposed power plants; evaluation of unavoidable environmental impact or irretrievable commitments of resources resulting from a selection of a particular site; evaluation of alternatives to the proposed site; and other governmental activities. Minn.Stat. § 116C.57, subd. 4 (1978).

site, applied to the MEQB for a Certificate of Site Compatibility for two 800-megawatt units at the Sherco site pursuant to the PPSA. By letter of November 11, 1974, NSP "indicated that it would waive the exempt status of the Henderson site if the Sherburne County site were ultimately certified by the MEQB for an additional 1,600 megawatts of generating capacity." At its next session, the legislature amended the Minnesota Energy Agency Act to require the MEA to promulgate criteria for determination of need for new power plants by September 15, 1975, and provided:

> On and after the effective date of the assessment of need criteria adopted pursuant to subdivision 1, no large energy facility shall be sited or constructed in Minnesota without the issuance of a certificate of need by the director pursuant to sections 116H.01 to 116H.15 and consistent with the criteria for assessment of need.

Act of May 17, 1975, ch. 170, § 4, 1975 Minn.Laws 498, 499 (codified at Minn.Stat. § 116H.13, subd. 2 (1978)). The MEA adopted CON regulations on September 30, 1975.[3]

Meanwhile, the MEQB's consideration of NSP's application for a Certificate of Site Compatibility proceeded. The Minnesota Pollution Control Agency took exception to the MEQB's willingness to grant site certification to NSP before a determination of need for the proposed plant had been made. In May 1975, the MPCA made the following statement concerning this process:

The Agency believes very strongly that (1) the need for the plant had not been justified, and (2) its construction will cause an unwarranted further deterioration of air quality and degradation of water quality as the result of the discharge of gaseous and liquid wastes from the operation of the plant.

\*     \*     \*     \*     \*     \*

The Agency wishes to express its deep concern and disagreement with the proposed process of siting the plant first and justifying the need for it at some later date. We believe it is entirely proper and in fact the responsibility of the Council, in the absence of authority for formal action by the Energy Agency, to require the company to justify the need for this plant in advance of any decision with regard to the siting aspect.

Despite this protest, the MEQB conducted hearings on NSP's application for a Certificate of Site Compatibility through the summer of 1975. The MEQB staff prepared an environmental report, dated August 1975, which indicates that the MEQB had not designated additional alternative sites but had considered only the Henderson and Sherco sites submitted by NSP because alternative sites had been eliminated by the work of the GEQC in 1972.[4] A citizens committee appointed by the MEQB recommended the Sherco site by a 14-to-5 vote in its report submitted August 29, 1975.

On November 10, 1975, the MEQB issued a single Certificate of Site Compatibility for the Sherco site to NSP for Sherco 3 and

---

3. The MEA assessment of need criteria provides that an application "shall be granted" if denial would probably result in "an adverse effect upon the future adequacy, reliability or efficiency of energy supply" to consumers in Minnesota or elsewhere, or if the proposed facility's output would have "socially beneficial uses" deemed significant to justify the need. In determining reliability, the MEA must consider the demand for electricity, including the applicant's demand forecast and the effects of conservation or other government programs, and the ability of other facilities to meet the demand, the effects that promotional activity may have had in producing demand, alternative ways of meeting it, and the appropriateness of the facility's size, type, and timing. In making a determination regarding the facility's socially beneficial uses, the MEA must consider the relationship of the proposed facility to overall state energy needs, effects on the natural and socioeconomic environments, and the effects of the facility in inducing future development. 6 MCAR § 2.0611C (1978).

4. As noted above, the membership of the GEQC and the MEQB consisted of many of the same holders of office. However, counsel stated on oral argument that only one individual, Natural Resources Commissioner Robert Herbst, served both on the GEQC in 1972 and on the MEQB in 1975.

Sherco 4 and appointed the MPCA to prepare an Environmental Impact Statement (EIS) for those facilities. In its findings, the MEQB recognized the "pending requirement" that NSP obtain a Certificate of Need for the new generating units, but stated erroneously that the MEA had not yet implemented criteria and procedures for making CON determinations. The MEA's regulations, as noted above, were in fact effective September 30, 1975, and on October 14, 1975, NSP had applied for a CON pursuant to those regulations for Sherco 3 and Sherco 4. Hearings on this application were conducted by the MEA in January 1976. On April 12, 1976, the MEA issued a single CON for Sherco 3 and Sherco 4 with in-service dates of May 1, 1981, and May 1, 1983, respectively.

It was during 1976 that Sherco 1, the first electric generating facility constructed by NSP at the Sherburne County site, became operational, and plaintiffs became aware of the effects on their land of coal-fired electricity generation. In December 1976, NSP requested MEQB's authorization to begin preliminary construction work on Sherco 3 before the EIS was completed. While MEQB's decision on NSP's request was pending, farmers and other residents of Sherburne County incorporated plaintiff CAPPP, Inc., and retained counsel "to represent it at all levels of the Sherco 3 and 4 proceedings." The MEQB granted authorization for NSP to begin limited preliminary work at the Sherco site on February 8, 1977, and July 13, 1977. The limited work authorization provided as follows:

THAT if NSP proceeds with the work described in this resolution, it does so entirely at its own risk recognizing the allowance of no vested property rights and recognizing that any work described in this resolution will not be relevant to nor be allowed as an argument or defense against any consideration of alternatives in the EIS process or against any permit conditions proposed by any person or agency in the permitting process on this matter * * *.

In June 1977, CAPPP, Inc., brought suit against NSP and the MEQB to challenge the issuance of the authorizations. On August 23, 1977, after hearing arguments from NSP, the AFL–CIO, and various state agencies that construction of Sherco 3 and 4 must begin in order to prevent future energy shortages, the MPCA granted an interim emission permit. CAPPP, Inc., expanded its lawsuit to challenge that permit.

On the morning of October 27, 1977, oral arguments were heard in the CAPPP, Inc., lawsuit. That afternoon, NSP announced it had new data that would revise downward its energy demand forecast. On November 1, 1977, the MEQB revoked its limited work authorizations and instructed NSP to halt construction. The CAPPP lawsuit was dismissed without prejudice on November 22, 1977.

The MPCA conducted public hearings during November 1977 on the draft EIS in order to evaluate further the impact of Sherco 3 and Sherco 4 on human health. The final EIS indicates that operation of Sherco units 1 to 4 is likely to contribute substantially to high, short-term ambient $SO_2$ (sodium dioxide) concentration, a significant health risk.

Following NSP's downward revision of it· demand forecast, on March 23, 1978, the MEA issued its findings, conclusion, and order severing and voiding the Certificate of Need for Sherco 4. Regarding that facility, for which NSP now sought an in-service date of 1987, the MEA director found that this requested time delay "increases the possibility that changes in technology, economic factors, load characteristics, fuel options and political and social considerations" are likely to result in a change in the optimal size and type of the facility necessary. As to Sherco 3, however, the director indicated that, even if its in-service date were extended to 1984, changes in technology and alternatives available by that time are not likely to result in a change in the choice of size or type of facility needed. To secure valid need certification, however, MEA required NSP to initiate a rehearing on the timing of Sherco 3.

In May and July 1978, CAPPP, Inc., requested that the MEQB declare the single Certificate of Site Compatibility voided by operation of the MEA's March 23, 1978, order. The MEQB made no response to these requests. On August 21, 1978, NSP submitted an application to MEA seeking a 1984 in-service date for Sherco 3. On December 13, 1978, CAPPP, Inc., brought this lawsuit and served a second amended complaint on August 27, 1979. Plaintiffs challenged the issuance of the Certificate of Site Compatibility to NSP on November 19, 1975, for two 800-megawatt electric generating plants in Sherburne County, Sherco 3 and Sherco 4, alleging the claims set out above.

On October 29, 1979, the MEA director issued his findings, conclusions, and decision granting NSP an amended CON for Sherco 3 with an in-service date of May 1, 1985. On December 21, 1979, the Ramsey County District Court entered the order in this lawsuit from which CAPPP appeals.

### Waiver of the Henderson Exemption

We consider first plaintiffs' argument that the MEQB was without jurisdiction to grant NSP a Certificate of Site Compatibility for the Sherco site because the legislature exclusively designated a site at Henderson, Minnesota, for this particular electric generating facility. When the legislature enacted the PPSA, it adopted a section stating that its provisions "shall not apply to the site for the large electric generating plant evaluated and recommended by [the GEQC] prior to the date of enactment, and also to high voltage transmission lines, the construction of which will commence prior to July 1, 1974," provided that utilities seeking the power line exemption file a statement to that effect with the MEQB. Act of May 23, 1973, ch. 591, § 17, 1973 Minn. Laws 1343, 1351 (current version of Minn. Stat. § 116C.67 (1978)).[5]

In *No Power Line, Inc. v. Minnesota Environmental Quality Council*, 262 N.W.2d 312 (Minn.1977), this court considered the

question of whether a utility which had filed a statement seeking the exemption provided by the second half of that "savings clause" could subsequently waive the exemption and submit to PPSA siting of its proposed line. We noted, first, that it is unusual for a party benefited by a "grandfather clause" exemption to affirmatively seek regulation. We concluded, however, that to allow an exempt utility voluntarily to seek the jurisdiction of the MEQB furthered the legislature's purpose, which we characterized as follows:

> By enacting the PPSA, the legislature sought to ensure that the future siting of power plants and transmission lines would be carried out in an orderly fashion according to a rational design, rather than haphazardly, and possibly unnecessarily, at the whim of individual public utilities whose decisions might fail to consider or comport with the public interest. Minn.St.1976, §§ 116C.55 to 116C.60. The two crucial concepts that permeate the entire act are that the process should be *orderly* and that there should be *public participation* in all stages of agency decision-making.

> \*     \*     \*     \*     \*     \*

> After long and serious deliberation, we have decided that the legislature would have intended MEQC to have jurisdiction based on our residual conviction that the legislature would have preferred the PPSA to apply to the fullest extent reasonably possible. Therefore, the legislature must have intended to permit the utilities to waive the exception it had carved out in their favor, even though exemption had previously been claimed and granted.

*Id.* at 321–22 (emphasis in original).

Plaintiffs seek to distinguish the power line exemption construed in *No Power Line* from the power plant exemption at issue here, noting that the power line exemption required an affirmative act on the part of any utility seeking to claim it.

---

**5.** No power plant siting application other than that resulting in the Henderson site recommendation was evaluated and acted upon by the GEQC.

A utility so exempt was required to seek permits from each county through which its power line ran, a fragmented, disorderly process. The power plant site exemption granted to NSP, on the other hand, demonstrated the legislature's recognition of the orderly, public decision-making process which had resulted in selection of the Henderson sites, thus meeting the goals of the PPSA as identified in *No Power Line*. Plaintiffs argue further that to permit NSP to waive its exemption unilaterally, rather than to construe it as a legislative designation of the Henderson site, would grant NSP a "special or exclusive privilege" prohibited by Minn.Const. Art. 12, § 1.

■ Our decisions regarding "special legislation" establish that a law which applies to members of one class, even if it is a class of just one member, is not impermissible so long as the distinguishing characteristics of the class reasonably justify singular treatment. *Visina v. Freeman*, 252 Minn. 177, 195–99, 89 N.W.2d 635, 650–52 (1958); *State v. Cloudy & Traverse*, 159 Minn. 200, 198 N.W. 457 (1924). Granting an exemption for the Henderson site, not permitting its waiver, was the act by which the legislature conferred a special privilege on NSP. Like other "grandfather clauses", the one at issue here was based upon differences reasonably justifying the legislature's determination to exempt the Henderson site from the PPSA procedures and did not constitute impermissible special legislation. Nevertheless, we can see no objection to the desire of NSP to subject itself to the procedures of the PPSA. The district court correctly concluded that *No Power Line* stands for the proposition that the exemption provided by section 116C.67 may be waived by the beneficiary of that exemption. We affirm the determination that the MEQB properly exercised its jurisdiction to consider NSP's application for certification of the Sherco site.

### Nuclear Accident Threat

■ Plaintiffs, in their second cause of action, questioned the reliability of the electrical system in the event of a nuclear accident and alleged that siting Sherco 3 and 4 in proximity to the Monticello nuclear power facility could have adverse impact on human and environmental resources. The district court concluded that these allegations raised the issue of a possible atomic accident at the nuclear facility and that possible resulting evacuation or long-term shutdown of the Sherco facility threatens the loss of reliability of the electric supply, not damage to the environment. The court dismissed this claim as outside the scope of MERA, which provides a remedy "to protect air, water, land and other natural resources located within the state from pollution, impairment, or destruction." Minn. Stat. § 116B.01 (1978).

We concur with the district court's determination that the reliability of the Sherco facility to produce energy in the event of a nuclear accident at Monticello is, at bottom, a question of energy supply. A lawsuit brought to prevent a reduction in or loss of the supply of energy produced at Sherco is not brought "to preserve the environment *in its natural state* from pollution, impairment, or destruction." *See State ex rel Skeie v. Minnkota Power Cooperative, Inc.*, 281 N.W.2d 372, 373 (Minn.1979). These allegations were properly dismissed.

### Continuing Validity of Certificate of Site Compatibility for Sherco 3

■ Plaintiffs argue, first, that the Certificate is void by operation of law because it was issued prior to issuance by the MEA of a CON, in violation of section 116H.13, subd. 2, which provides that "[o]n and after the effective date of the assessment of need criteria * * * no large energy facility shall be sited * * * without the issuance of a certificate of need * * *." The CON criteria became effective September 30, 1975. NSP was issued its Certificate of Site Compatibility on November 10, 1975. The CON was not granted until April 12, 1976.

That the grant of a Certificate of Site Compatibility was outside of strict compliance with the law is clear from Minn.Stat. § 116H.13, subd. 2 (1978). Defendants point

out, however, that NSP applied for its Certificate of Site Compatibility on November 1, 1974, and that the PPSA gives the MEQB only one year to designate a site and grant a Certificate. They argue that there was not enough time after September for NSP to procure a CON before the MEQB was required to grant the Certificate of Site Compatibility. In *No Power Line, Inc. v. Minnesota Environmental Quality Council*, 262 N.W.2d 312 (Minn.1977), this court approved the MEQB's grant of a Certificate of Corridor Compatibility for a high voltage power line prior to the MEA's grant of a CON. The court noted that "the sequence in which the statutes were adopted meant that [the utility] was granted a certificate of corridor compatibility prior to, but contingent upon, the issuance of the certificate of need." *Id.* at 326.

Strict application of the statute results in the conclusion that after September 30, 1975, the MEQB lacked statutory authority to grant site designation to a plant which had not been granted a CON.[6] However, in April 1976, NSP did successfully establish need for the Sherco 3 and 4 facilities to the MEA's satisfaction. Had the MEQB withheld a decision on the Certificate of Site Compatibility pending the MEA's grant of a CON, the Certificate of Site Compatibility would then have been granted. Putting aside the inaccuracy, later discovered, of NSP's demand forecast, the utility did comply with the spirit of the regulatory scheme. We cannot conclude that the fact that the Certificate of Site Compatibility was granted before the CON was issued renders it invalid in this case.

The second prong of plaintiffs' argument is that the Certificate is void by operation of law because it was issued "prior to, but contingent upon", the grant of a CON.

Plaintiffs argue that when the MEQB revoked the CON as to Sherco 4 and as to the timing of Sherco 3, the Certificate of Site Compatibility issued in November 1975 was rendered invalid.

In his March 23, 1978, decision, the director of the MEA considered NSP's request for a change in the in-service date of Sherco 3 to 1983 and of Sherco 4 to 1987.[7] He noted that NSP had reduced its demand forecast because of slowed economic growth but had failed to provide specific information explaining the change. Regarding Sherco 3, NSP satisfied the director that the MEA's previous determination of need with respect to the *size* and *type* of facility remained valid even if the in-service date for that facility was extended to 1984. Regarding Sherco 4, however, the director determined that this "further extension into the future" presented the possibility that changed technology and political and social factors would result in a change in the best size, type, and timing of the facility.[8] He

6. That the legislature intended site designation to depend upon a determination that the facility is needed is underscored, as plaintiffs note, by the fact that the legislature, which in 1974 had targeted July 1, 1976, as the date on which assessment of need criteria must be promulgated, required the criteria to be ready almost a full year earlier, on September 15, 1975, once NSP waived its exemption and sought certification of the Sherco site.

We note, further, that the Power Plant Siting Advisory Committee, in its recent report to the MEQB, recommends that determinations regarding need for and siting of the power facilities be coordinated:

Considering the Certificate of Need before the siting or routing process begins creates problems because the two issues are closely related and the need process may not receive the necessary citizen input. *While the decisions should continue to be made by separate agencies we recommend that efforts should*

*be made to coordinate the Certificate of Need, siting and routing decisions and that they occur within the same time frame.* Power Plant Siting Advisory Committee 1979–1980, *Report to the Minnesota Environmental Quality Board: Options for Electric Energy Supply* (hereinafter Advisory Committee Report) 7, 84 (June 19, 1980).

7. Because the delays sought were for periods of time exceeding one year, the director determinated that the MEA had jurisdiction over NSP's request. Under Energy Agency regulations, a delay in the in-service date of a facility previously certified by the director for up to one year is not subject to review. 6 MCAR § 2.0641B.2 (1978).

8. In assessing need, the Energy Agency regulations require the director to consider, *inter alia*, "the appropriateness of the size, the type, and the timing of the proposed facility * * *." 6 MCAR § 20611C.2a (1978).

ordered that the CON for Sherco 4 be voided but that, with regard to Sherco 3, "[t]he agency does not hereby relinquish its jurisdiction over that facility nor is the certification thereof voided; only that portion of the certification related to timing is voided." On October 29, 1979, after rehearing on the timing issue, the MEA director established May 1, 1985, as the in-service date for Sherco 3, a date which provided "additional time for thorough environmental review" of Sherco 3 alone.[9]

Plaintiffs argue that the MEA's voiding of need certification for Sherco 3 as to timing invalidates the Certificate of Site Compatibility granted by the MEQB for that plant. The district court concluded that such a result would absurdly extend the language of *No Power Line*, which held the grant of site designation "contingent upon" the grant of a CON. We agree.

The procedures adopted by the legislature for the siting of power plants involve essentially a two-step process. First, a utility must obtain a CON from the MEA. *See* Minn.Stat. § 116H.13 (1978) (amended 1979, 1980). Second, the utility must obtain a Certificate of Site Compatibility from the MEQB. *See* Minn.Stat. § 116C.57 (1978). Once both of these Certificates have been issued, only three grounds exist upon which the Site Certificate can be declared invalid.

█ The first ground upon which a Site Certificate may be declared invalid is if one of the conditions specified in section 116C.645 occurs, such as if a utility makes a false statement in its application for a site or in other statements or studies required by the MEQB. *See* Minn.Stat. § 116C.645 (1978). The second ground upon which a Site Certificate may be declared invalid is if the utility fails to commence construction within four years of the issuance of the Certificate, *see id.* § 116C.62, and the MEQB determines that significant changes have taken place in the circumstances existing at the time the Certificate was issued. *See* 6 MCAR § 3.079A (1978). The final ground upon which a Site Certificate may be declared invalid is if it is determined that the hearing process failed to meet the statutorily mandated due process requirements. *See In re Condemnation Proceedings for the Wilmarth Line of the C U Project*, 299 N.W.2d 731 (Minn.1980). Unless one of these reasons exists, the Site Certificate must stand. Nothing in the record before this court indicates the existence of one of these three reasons.

The conclusion reached here is consistent with the legislative objective of siting "large electric power facilities in an orderly manner compatible with environmental preservation and the efficient use of resources." Minn.Stat. § 116C.53, subd. 1 (1978). The process contemplated by the legislature recognizes the great length of time that the final approval of power plant construction takes. The injection of an additional ground for the reconsideration of site would only add time to an already lengthy process. It is obvious that at some point the siting process must be final and the utility must be allowed to construct the power plant in order to assure that the future energy demands of this state are met.

### Laches

█ Appellants' final contention is that the Site Certificate should be declared invalid because the MEQB failed to consider feasible and prudent alternatives before selection of the Sherco site. The district court held that the appellants were prevented by laches from attacking the Site Certificate on this basis. We agree with the district court.

Before an analysis is made of the facts that support a finding of laches in this case, it is important to note that the doctrine has

---

The correctness of the director's assessment is borne out by recommendations recently made by the Power Plant Siting Advisory Committee. The Committee recommends "a shift to the smallest plants which are feasible," and

that "the maximum plant size be in the 200 to 400 Megawatt range." Advisory Committee Report, note 6, at 5.

**9.** Environmental review of Sherco 3 alone was ordered by the district court.

received a "lukewarm reception in suits presenting environmental questions * * *." *MPIRG v. Butz*, 498 F.2d 1314, 1324 (8th Cir. 1974). Nevertheless, when the plaintiff has been guilty of unreasonable delay and when this delay is shown to be prejudicial to the other party, federal courts have applied the laches doctrine in environmental cases. *See Woida v. United States*, 446 F.Supp. 1377, 1390–91 (D.Minn.1978); *Organizations United for Ecology v. Bell*, 446 F.Supp. 535, 552–53 (M.D.Pa.1978); *Clark v. Volpe*, 342 F.Supp. 1324, 1327–28 (E.D.La.), *aff'd per curiam*, 461 F.2d 1266 (5th Cir. 1972).

The district court found plaintiffs had been aware of the alleged defect in the Site Certificate at least since the Certificate was issued on November 10, 1975. Because no new facts had developed since that date, the district court held that plaintiffs' four-year delay in bringing this suit was unreasonable. In finding prejudice to both NSP and the MEQB resulting from this delay, the district court stated:

> [S]ince the certificate of site compatibility was issued in 1975, NSP and MEQB have continued through the permitting process. An EIS was prepared for which NSP contributed over $450,000. Hearings have been conducted by the MEQB at the various siting states and a rehearing on the in-service date for Sherco 3 has been completed. NSP and MEQB would be prejudiced if these efforts and expenditures of time and money were deemed wasted.

The trial court was correct in holding that laches was applicable to this cause of action. Plaintiffs should have challenged the alleged defects in the Site Certificate

long before the filing of this suit. To allow a challenge based on omissions of the MEQB during the site hearings would prejudice the MEQB and NSP, both of which have invested extraordinary amounts of time and money in subsequent proceedings.

Affirmed.

WAHL, Justice (dissenting).

I respectfully dissent from the opinion of the majority insofar as it holds that the MEQB need not reconsider its siting determination for Sherco 3 in light of the facts and circumstances of this case, i. e., where one Certificate of Need was issued for two 800-megawatt plants, where one certificate of site compatibility was granted for 1,600 megawatts of generating capacity, where applicant's energy demand forecast was so far reduced as to result in cancellation of the determination of need for one plant, Sherco 4, and where construction of the other plant, Sherco 3, has been delayed for four years, from 1981 to 1985.

Plaintiffs argue, as the majority has noted, that the MEA's voiding of need certification for Sherco 3 as to timing invalidates the Certificate of Site Compatibility granted by the MEQB for that plant. The majority agrees with the conclusion of the district court that such a result would absurdly extend the language of *No Power Line*, which held the grant of site designation "contingent upon" the grant of a Certificate of Need. By the same token, however, recognizing the Certificate of Site Compatibility as permanent and inviolate works an equally absurd distortion of the legislature's intent.[1] If NSP's need fore-

---

1. The district court also concluded that the principle of "nonproliferation" announced in *People for Environmental Enlightenment and Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council*, 266 N.W.2d 858–64 (Minn.1978), confirms the selection of the Sherco site, where two electric generating facilities already operate, for the construction of two more such plants. I do not agree.

The "non-proliferation policy" identified in *PEER* cannot be strictly applied to power plant siting consistent with the terms of the Energy Act, whose purpose is "to encourage thrift in

the use of energy, and to maximize use of energy-efficient systems * * *." Minn.Stat. § 116H.01 (1978). The PPSA itself requires that, in making site decisions, the MEQB must consider new technologies which will minimize adverse environmental effects and possible beneficial uses of waste energy. Minn.Stat. § 116C.57, subd. 4(3), (4) (1978). Furthermore, MEQB rules encourage siting decisions which "permit significant conservation of energy or utilization of by-products" and "minimize the distance to large load centers." 6 MCAR § 3.074H. 1. j., k. These statutes and regula-

cast is eventually revised so much that a new generating facility is not necessary until 1990, surely NSP may not continue to rest on the 1975 site designation. The MEA itself, by its order regarding Sherco 4, explicitly recognized that changes in technology, load and waste management policies, and social and political conditions might render the determination of Sherco 4's size and type obsolete. The same observation can be made regarding site designation. The in-service date of Sherco 3 having been extended now until 1985, one year later than the time the MEA director had determined alternative technologies to be unavailable, I conclude that the MEQB erred in refusing to reconsider the site designation made in 1975.

This conclusion is bolstered by the MEA regulations which require that the MEA "recertify" the need for a facility whenever an applicant proposes a reduction of more than 50 megawatts generating capacity. Because only one Certificate of Need was issued for both Sherco 3 and 4, plaintiffs argue that the voiding of the certification for Sherco 4, a reduction of 800 megawatts capacity, required "recertification" of the entire project. *Cf.* 6 MCAR § 2.0641C. 1 (1978). The MEA in this case has interpreted its regulations to mean that certification of Sherco 3 is not voided except as to timing. Those regulations, as cited above, do, however, suggest that a change as significant as this one, in which an entire plant, with 800 megawatts generating capacity, is decertified, should result in review or reconsideration of such factors as the site of the plant. In *People for Environmental Enlightenment and Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council*, 266 N.W.2d 858 (Minn.1978), this court held that a PPSA site designation for a high-voltage transmission line that im-

pairs, pollutes, or destroys protected resources cannot be approved, consistent with MEPA, if there is a prudent and feasible alternative available. Here, the MEA's decertification of 800 megawatts of generating capacity for the NSP project might well make other sites feasible and desirable alternatives for a plant half the size of that originally proposed.

Plaintiffs have also challenged the Certificate of Site Compatibility on the ground that the MEQB failed to evaluate feasible and prudent alternatives to the Sherco site, as required by the Minnesota Environmental Policy Act, Minn.Stat. § 116D.04, subd. 6 (1978). The majority holds that the appellants are prevented by laches from attacking the certificate on this basis. If the plaintiffs had done nothing for the four years between 1975 and 1979 I would be more inclined to agree, but this is not the case. The MEQB issued the single Certificate of Site Compatibility on November 10, 1975. It was not until 1976, when Sherco 1 became operational, that farmers and other residents of Sherburne County who now constitute CAPPP became aware of the effects on their land of coal-fired electricity generation. In 1977, while NSP's request was pending for MEQB authorization to begin preliminary construction work on Sherco 3 before the EIS was completed, plaintiff CAPPP was incorporated and retained counsel "to represent it at all levels of the Sherco 3 and 4 proceedings." In June 1977, CAPPP challenged the issuance of limited work authorization by a lawsuit which was expanded in August 1977 to challenge the granting of an interim emission permit. This lawsuit was dismissed without prejudice in November 1977, after NSP had revised its energy demand forecast downward and the MEQB had revoked the limited work authorizations and halted

tions require the MEQB to consider the possibility that alternative plant locations may be capable of more efficient utilization of waste heat, for example, or minimize the distance over which the generated power must be transmitted.

Furthermore, the Environmental Impact Statement prepared by the MPCA regarding the Sherco power plants makes clear that am-

bient air quality levels will be significantly affected if Sherco 3 and 4 are constructed where two coal-burning generating plants are already in operation. Concentrated burning of large amounts of Western coal in multiple facilities at a single location contributes to air pollution and adverse human health effects. For these reasons, the siting of power lines cannot strictly control power plant siting determinations.

construction. CAPPP responded to MEA's March 23, 1978 order decertifying Sherco 4 by requesting the MEQB to declare the single Certificate of Site Compatibility voided by that order. Receiving no reply, CAPPP brought this lawsuit in December 1978.

I do not find, on the above record, that plaintiffs were sleeping on their rights. Nor am I persuaded that defendants have made the clear showing of prejudice to the public interest required to bar an action to protect the environment on the basis of laches. *See Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1329–30 (4th Cir. 1972). Furthermore, it is not clear from this record that the MEQB made an independent evaluation of the GEQC record concerning alternatives before considering only the Henderson and Sherco sites. *See Muehring v. School District No. 31 of Stearns County*, 224 Minn. 432, 436, 28 N.W.2d 655 (1947) (agency granted decision-making authority may not ordinarily delegate that power to the public or to private individuals). I am constrained to note, in addition, that, although the MEQB is required to consider alternatives to the proposed site when it renders a decision on an application for site designation, as the regulatory process was administered by the MEQB in this case, an Environmental Impact Statement was not prepared regarding the proposed generating facilities until after a Certificate of Site Compatibility was granted. That timing for the preparation of an Environmental Impact Statement appears to be inimical to the purpose of the Minnesota Environmental Policy Act, which provides:

> 116D.04 ENVIRONMENTAL IMPACT STATEMENTS. Subdivision 1. Where there is potential for significant environmental effects resulting from any major governmental action or from any major private action of more than local significance, *such action shall be preceded by a detailed statement* prepared by the responsible agency or, where no governmental permit is required, by the responsible person, on:
>
>   \*    \*    \*    \*    \*    \*

> Subd. 4. Prior to the preparation of a final environmental statement, the person responsible for the statement shall consult with and request the comments of every governmental office which has jurisdiction by law or special expertise with respect to any environmental effect involved. Copies of the drafts of such statements and the comments and views of the appropriate offices shall be made available to the board and the public: *The final detailed environmental impact statement* and the comments received thereon shall precede final decisions on the proposed action and *shall accompany the proposal through an administrative review process.*

Minn.Stat. § 116D.04, subd. 1, 4 (1978) (emphasis added). This court has previously indicated that MEPA and the Power Plant Siting Act should be construed harmoniously. *See Floodwood-Fine. Lakes Citizens Group v. Minnesota Environmental Quality Council*, 287 N.W.2d 390, 397 (Minn.1979); *People for Environmental Enlightenment and Responsibility (PEER), Inc. v. Minnesota Environmental Quality Council*, 266 N.W.2d 858, 865 (Minn.1978); *No Power Line, Inc. v. Minnesota Environmental Quality Council*, 262 N.W.2d 312, 323 (Minn. 1977). Further, the Power Plant Siting Act by its own terms requires the MEQB to comply with MEPA in siting decisions:

> Within a year after the board's acceptance of a utility's application, the board shall decide in accordance with the criteria specified in section 116C.55, subdivision 2, the responsibilities, procedures and considerations specified in section 116C.57, subdivision 4, *and the considerations in chapter 116D* which proposed site is to be designated.

Minn.Stat. § 116C.57, subd. 1 (1978) (emphasis added).

In *No Power Line, Inc.*, the MEQB also failed to prepare an Environmental Impact Statement before the corridor was selected. We stated:

> Appellants argue that it was reversible error for the MEQC not to require an EIS

at the corridor-selection stage of the proceedings. Since the designation of a corridor was a "major governmental action" with "potential for significant environmental effects," and since this was the last discretionary stage in the proceedings, the lack of an EIS violated both the spirit and the letter of MEPA.

262 N.W.2d at 325. In that case we concluded that the MEQC's failure to require an Environmental Impact Statement at the corridor-selection stage of the proceedings was not reversible error, although to have required an EIS would have been preferable, because (1) the law gave MEQC discretion to decide when an EIS was required; (2) no statute specifically requires that the EIS be prepared at the corridor-selection stage; (3) an EIS was, in fact prepared and available to guide the MEQB when the specific route was selected; and (4) the court was convinced that the MEQB did consider factors which the PPSA required it to evaluate. Some of these considerations are present in the case before us; but the seemingly crucial one—the fact that the MEQB did have an EIS before it when it made a specific site determination—is not.

In this case, no Environmental Impact Statement was prepared before the Sherco site was selected. Thus, the MEQB did not even substantially comply with one important purpose of MEPA: to insure that state decisions be preceded by a thorough consideration of environmental factors. If the standard practice of the MEQB is to perform environmental review after the key decisions concerning the siting of power facilities have already been made, the EIS would be a rather useless gesture.

Because, in this case, no real consideration of alternatives was made, and for the reasons set out above, the MEQB should reconsider its siting determination in the context of the environmental review which has already been ordered by the district court.

PETERSON, J., took no part in the consideration or decision of this case.