Albert CLARK et al.

v.

John A. VOLPE, Secretary of Transportation of the United States of America and Leon Gary, Director of Department of Highways, State of Louisiana.

Civ. A. No. 72-541.

United States District Court,
E. D. Louisiana,
New Orleans Division.

March 29, 1972.

Richard M. Troy, Jr., New Orleans, La., for plaintiffs.

Blake G. Arata, City Atty., New Orleans, La., for intervenor City of New Orleans, plaintiff.

Ralph L. Kaskell, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for intervenor Boh Bros., defendant.

John R. Schupp, Asst. U. S. Atty., New Orleans, La., for defendant United States.

Robert Jones, Dept. of Highways, State of La., Baton Rouge, La., for defendant State of La.

R. BLAKE WEST, District Judge.

REASONS FOR JUDGMENT

Plaintiffs, six individuals and two non-profit corporations, bring this class action for injunctive relief, seeking to

delay, and ultimately to prevent, the construction of a federal-aid highway known as I–610 through City Park, in the City of New Orleans. Plaintiffs, claiming to represent a class of individuals who use the park frequently and are interested in its development, allege that defendants, John A. Volpe, Secretary of Transportation of the United States of America, and Leon Gary, Director of the Department of Highways, State of Louisiana, by failing to comply with provisions of five federal statutes, have rendered the construction of I–610 illegal. The City of New Orleans and Boh Brothers Construction Company have intervened on behalf of defendants.

## FIRST CAUSE OF ACTION

The Department of Transportation Act of 1966, section 4(f) [1] and the Federal Aid to Highway Act of 1968, section 138 [2] became effective law on August 23, 1968. These Acts provide that the Secretary of Transportation shall not approve any project which requires the use of parkland without making a determination that (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to the parkland. Plaintiffs allege that no such determinations have been made.

## SECOND CAUSE OF ACTION

The National Environmental Policy Act of 1969, section 102(2) [3] became effective law on January 1, 1970. This Act provides that in every major federal action significantly affecting the quality of the environment, the responsible official (the Secretary of Transportation in the case of federal highways) shall conduct studies and prepare a detailed statement concerning the environmental impact of a proposed action. Plaintiffs allege that no environmental impact statement has been made.

## THIRD CAUSE OF ACTION

Section 128 of Title 23 of the United States Code became effective law on August 27, 1958. This statute provides that any state highway department which submits plans for a federal-aid highway to go through any city must certify to the Secretary of Transportation that public hearings have been held to consider the economic effects of such a highway. The statute was amended August 23, 1968 to require the state highway department to certify additionally that a public hearing has been held to consider the environmental impact of such a highway. Plaintiffs allege that no public hearings were had concerning the six-lane I–610 highway, but concede that a public hearing was held in 1958 before the New Orleans City Council concerning the effects of a four-lane federal-aid highway to be routed through City Park.

## FOURTH CAUSE OF ACTION

Section 134 of Title 23 of the United States Code, as amended, became effective law on July 1, 1965. The statute provides that after July 1, 1965, the Secretary of Transportation shall not approve any project in an urban area of more than fifty thousand population unless he finds that such project is based on a continuing comprehensive transportation planning process, carried on cooperatively by the state and local community in conformance with the objectives of the Act. Plaintiffs allege that no determination has been made that the I–610 highway was based on a "continuing comprehensive transportation planning process".

## LACHES

Defendants and intervenors moved to dismiss this action on the basis of laches. Defendants and intervenors assert that plaintiffs have delayed inexcusably in bringing suit and that plaintiffs' de-

1. 49 U.S.C. § 1653(f).

2. 23 U.S.C. § 138.

3. 42 U.S.C. § 4332.

lay has resulted in prejudice to defendants and intervenors. An evidentiary hearing, confined to the issue of laches, was held on March 21, 1972. After careful consideration of the record, the testimony and exhibits introduced at the hearing, the stipulations of the parties, and the controlling legal authorities, the Court concludes, somewhat reluctantly, that plaintiffs' action is barred by application of the doctrine of laches.

### Chronology

The prospect of constructing a federal-aid highway through City Park first came to public attention some fifteen years ago in 1956 when the New Orleans City Council received a report by Howard, Needles, Tammen, and Bergendorf, consulting engineers, which considered the feasibility of planning a highway through the Park.[4] A public hearing was held on February 11, 1958, at which the merits of constructing a highway through City Park was debated, and at which the City Planning Commission submitted a map on which was shown the proposed route of what is now known as the I-610 Highway.[5] The route bisected the park from east to west and vice versa, and was immediately adjacent and parallel to railroad tracks which have been in place for many years prior to conception of any highway plan.

Defendants and intervenors have shown that the proposed construction of an interstate highway through City Park has been a matter of considerable and extensive public discussion ever since the 1958 hearing. On March 22, 1964, the Times-Picayune, a daily morning newspaper of wide circulation, published an article concerning the proposed highway, accompanied by two photographs showing clearly that the highway would traverse City Park parallel to the railroad tracks.[6] Many other newspaper clippings demonstrating public notice of the I-610 project were admitted in evidence.[7]

During 1965, the New Orleans City Park Improvement Association negotiated with the State Department of Highways for the purchase outright of a 200 foot wide stretch of land adjacent to the railroad tracks to provide a highway location, and on February 4, 1966, the City of New Orleans and the City Park Improvement Association sold the strip of land in fee to the State of Louisiana for the sum of $1,240,000.00.[8] The State became the owner of the highway location on that date, and the City expended the funds derived from the sale to develop the northern portion of City Park for public use.[9]

The task of highway design had been undertaken in 1958. Approval of design as a six-lane highway was given in October of 1962.[10] Design approval for the section of land acquired from City Park was given on August 25, 1966.[11]

The piecemeal preliminary requirements for actual construction of the I-610 began in 1968. Advertisement for bids for sub-surface drainage work occurred in the middle of that year.[12] Ad-

---

4. The report was admitted in evidence as Boh Exhibit #2.

5. A transcript of the hearing and a copy of the map were admitted in evidence as Boh Exhibit #1.

6. The article was admitted in evidence as Exhibit #D-1. A portion of the article reads as follows: "Giant ribbons of concrete are stretching in and around the city laying forth a gift of quicker and safer highway travel . . . Ultimately, an alternate route of I-10, known as I-610, will follow the rail tracks along the lake side through Lakeview and City Park and into Gentilly."

7. Boh Exhibits #17–#19; Exhibits #D-1 through #D-10.

8. Exhibit #D-3 and #D-10.

9. Boh Exhibit #3, deposition of Ernest A. Carrere, former head of City Park Board of Commissioners.

10. Exhibit #D-4, January 22, 1965 newspaper article headlining the six-lane nature of the highway.

11. Pre-trial brief of intervenor Boh Brothers, p. 4.

12. Exhibit #D-8, September 12, 1968 newspaper clipping.

vertisement for bids for clearance of the strip was made in mid-1970.[13]

On May 25, 1971, the Secretary of Transportation gave final approval to the I–610 federal-aid highway project. On that same date highway contractors were invited to bid on the section of land parallel to the railroad tracks in City Park. Intervenor, Boh Brothers, was the successful bidder, and a construction contract was signed on July 14, 1971.[14] Boh Brothers was authorized to begin construction on July 19, 1971.[15]

Photographs taken on July 22, 1971 show that signs were installed on the project advising the public that a federal highway was being constructed.[16] Aerial photographs taken on July 25, 1971 showed clearly that obvious and extensive demolition of buildings and commencement of highway construction had taken place outside of the park and that the highway was heading inexorably toward the Park from both the East and the West.[17]

Highway construction work has proceeded on the sector of state owned land through the Park since July 19, 1971 and continues at the present time. The segment of land has been graded, and sub-surface drainage has been installed. The work has necessitated the relocation of Zachary Taylor Drive, a roadway in the Park. Permanent structures such as pilings and footings have been and are now being erected. Boh Brothers estimates that 25% to 30% of the total work has been completed.[18]

Plaintiffs' suit to enjoin further construction was not filed until February 24, 1972. Defendants and intervenors urge that it would be highly prejudicial to them to be required to halt construction at this late date.

### Can Laches Apply?

Plaintiffs submit that laches cannot apply to a suit brought by a private citizen asserting a public right. In support of that contention plaintiffs cite Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968), in which case plaintiffs, under Title II of the Civil Rights Act of 1964, were awarded attorneys' fees on the theory that plaintiffs were "private attorneys general" suing in protection of the public interest.

■ Styling themselves as "private attorneys general", plaintiffs claim derivative sovereign immunity to the defense of laches. The recent cases of Pennsylvania Environmental Council v. Bartlett, 315 F.Supp. 238, 246 (M.D.Pa., 1970), aff'd 454 F.2d 613 (3d Cir., 1971) and Harrisburg Coalition Against Ruin. Envir. v. Volpe, 330 F.Supp. 918 (M.D.Pa., 1971), both suits seeking injunction of highway construction for ecological reasons, although holding that laches did not apply in those cases, clearly considered that the doctrine can apply in a case such as the instant one. This Court agrees that laches can constitute a defense in this case. The Court does not believe that Congress intended that a plaintiff should be permitted inexcusably to delay the filing of an injunction suit to the prejudice of other parties and after the expenditure of millions of dollars of public funds.

### Does Laches Apply?

Thus, the issue becomes, not whether laches can apply, but whether laches does apply under the facts of this particular case. "Laches is determined in the light of all the existing circumstances and requires that the delay be unreasonable and cause prejudice to the adversary. Sobosle v. United States Steel

---

13. Boh Exhibit #6; Exhibit #D–10.

14. Boh Exhibit #10.

15. Boh Exhibit #13.

16. Boh Exhibit #21 through #24.

17. Boh Exhibit #25 through #32.

18. Testimony of Alvin Flettrich, project engineer.

Corp., 359 F.2d 7 (3d Cir. 1966)." Pennsylvania Environmental Council, Inc. v. Bartlett, *supra,* 315 F.Supp. at 246.

■ Laches is not merely a question of time; it is a question of diligence as well. Willey v. United States, 245 F. Supp. 669, 676 (E.D.Ill., 1965). There is no certain period of time within which a plaintiff may reasonably delay before filing suit; that "reasonable" period varies upon the circumstances of each case. The rule was stated in Burnett v. New York Central Railroad Company, 380 U.S. 424, 435, 85 S.Ct. 1050, 1058, 13 L.Ed.2d 941 (1965):

> "Whether laches bars an action in a given case depends upon the circumstances of that case and 'is a question primarily addressed to the discretion of the trial court.' Gardner v. Panama R. Co., 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31."

■ Laches is an equitable doctrine and will be applied where it would be inequitable to permit plaintiffs to proceed. In Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946), Justice Frankfurter held that:

> "Equity eschews mechanical rules; it depends on flexibility. Equity has acted on the principle that 'laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced,—an inequity founded upon some change in the condition or relations of the property or parties.' Galliher v. Cadwell, 145 U.S. 368, 373, 12 S.Ct. 873, 875, 36 L.Ed. 738; see Southern Pacific Co. v. Bogert, 250 U.S. 483, 488, 489, 39 S.Ct. 533, 535, 536, 63 L.Ed. 1099."

■ It is the considered opinion of this Court that, in light of the circumstances summarized above, laches should properly apply in the present action. The Court is convinced that for a period of many years prior to the commencement of construction of Highway I–610 through City Park, plaintiffs and members of the class which they claim to represent are charged with knowledge that a highway was to be built through the park.

This is not to suggest, of course, that plaintiffs could have filed suit prior to the effective dates of the statutes upon which they rely. Plaintiffs cannot sleep on rights until such rights come into existence. However, it is the opinion of the Court that plaintiffs did delay unreasonably after acquisition of their rights.

The statutes upon which plaintiffs base this suit became effective law on various dates ranging from 1965 to 1970. On July 1, 1965 plaintiffs were entitled to claim that no determination had been made that I–610 was based on a "continuing comprehensive transportation planning process".[19] On August 23, 1968 plaintiffs were entitled to claim that no public hearings were had to consider the environmental impact of the highway,[20] and were entitled to claim that the secretary had made no determinations as to prudent, feasible alternatives to the highway or as to possible planning to minimize harm.[21] On January 1, 1970 plaintiffs were entitled to assert that no environmental impact statement had been prepared.[22] Plaintiffs could have filed suit within a reasonable time after the effective dates of the various statutes and sought a Court order requiring the responsible officials to comply with the provisions of the newly enacted legislation. Had plaintiffs so filed, the Court might have considered their cause before a single tree had fallen and before a single dollar of public money was expended on highway construction. Plaintiffs, however, rested on their newly acquired rights despite ample and continual evidence that I–610 would soon transect the Park.

■ Plaintiffs were, of course, entitled to rely on a presumption that public

19. 23 U.S.C. § 134.

20. 23 U.S.C. § 128.

21. 49 U.S.C. § 1653(f); 23 U.S.C. § 128.

22. 42 U.S.C. § 4332.

officials would act in accordance with the statutes cited and administer those statutes properly. Norton v. McShane, 332 F.2d 855 (5th Cir., 1964), cert. den. 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965); Continental Bank & Trust Company v. Brandon, 297 F.2d 928 (5th Cir., 1962); Arab Corporation v. Bruce, 50 F.Supp. 350 (E.D.La., N.O.Div., 1943), aff. 142 F.2d 604 (5th Cir., 1944). The Secretary's final approval of the I–610 project was not given until May 25, 1971. Until that date plaintiffs might have presumed that the Secretary would not approve the project without first reporting on the project's environmental impact. Plaintiffs claim that it was not until May 25, 1971 that they were on notice that approval was given without regard to requirements of the statutes, and that it was not until that date that they had reason to suspect non-compliance.

Accepting, *arguendo*, May 25, 1971 as the crucial date in determining laches, plaintiffs' action is, in the opinion of the Court, nevertheless barred. Plaintiffs characterize themselves and the class represented by them as persons vitally concerned with the affairs of the Park and persons who visit the Park frequently. It is inconceivable that plaintiffs, charged with knowledge of approximately fifteen years of publicity concerning the highway, were not on notice as of May 25, 1971 that actual construction would soon proceed unless legal action was promptly initiated. Nevertheless, plaintiffs stood idly by during the remaining months as bulldozers and chain saws stripped and leveled the land and as vast sums of public money were expended on highway construction. Finally, after the area had been laid barren of trees or grass, and after several million dollars had been spent for highway development, plaintiffs, on February 24, 1972, belatedly filed suit to halt construction. The Court holds that, under the circumstances of this particular case, plaintiffs' delay in filing suit, during which delay the very acts of which they complain were being performed, was unreasonable, and defendants and intervenors would be substantially prejudiced if plaintiffs were allowed injunctive relief.[23]

23. The case of Road Review League, Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D.N.Y., 1967) did not directly involve the issue of laches. Nevertheless, that Court provided a thorough discussion of the inequities and prejudice attendant to delay in filing suit to halt highway construction. Although plaintiffs in that case delayed less than ten months in bringing suit, the Court stated:

"It does not follow, however, that a court of equity may close its eyes to the position in which the State now finds itself. The State has obtained a commitment from the federal government for many millions of dollars for the construction of this road. In reliance on this commitment, it has entered into a construction contract for over $26,000,000. The contractor has already spent or committed almost $9,000,000 under that contract for labor, materials and equipment.

"The State has spent over $1,000,000 in engineering the Chestnut Ridge route. It has acquired 92 rights of way along that route. It has made offers to property owners totalling over $2,000,000, and has already reached agreement with property owners for rights of way on claims aggregating over $200,000.

"To enjoin defendants at this stage from carrying out the commitment of the federal government to provide 90 per cent of the necessary funds for this project would create a chaotic situation. Plaintiffs argue that the damage to the State could be mitigated, that the rights of way which the State has acquired could be sold or returned to their former owners, that the course of the road could be changed without undue hardship. These arguments do not seem to me to be realistic. Some loss, as for example, engineering expenses, would obviously be irretrievable. In all likelihood, the ultimate loss would amount to much more. Substantial delay, perhaps amounting to over two years, would be encountered before a new route could be surveyed and engineered.

"The Highway Administrator's decision was made on April 6, 1966. Plaintiffs could have sued then. Subsequent

In ruling as it does, the Court is keenly aware of the importance of preservation and protection of our parklands in particular and of the environment in general. Obviously, the Congress, through passage of the statutes considered herein, has become increasingly concerned with and involved in the field of ecology.[24] These statutes are the initial legislative tools designed to preserve the beauty of the natural environment and to sustain the environment's capacity to support life. The purpose of these statutes is not served, however, when suit is delayed until after the environment is already substantially altered. In the Court's opinion, it is logical to conclude that the Congress did not intend that plaintiffs should delay until after substantial alteration of the environment to demand studies as to the consequences of that alteration. Conversely, the statutes are designed to promote inquiry as to ecological impact *before* an area of natural beauty is affected. Had plaintiffs not procrastinated while bulldozers desolated a strip of land through the park and while vast sums of public money were expended, then they might have proceeded without prejudice to anyone. The Court is of the opinion that, unfortunately, plaintiffs did not take action until it was too late. The Court is compelled, therefore, to dismiss the action by application of the doctrine of laches.

events have not materially affected that decision. This action was not begun until February 3, 1967. In the meantime, both federal and state authorities have changed their position in reliance upon that decision. This comes perilously close to laches. At the very least, it is a factor which this court must take into account. The court would not be justified in disregarding it without a stronger showing of illegality of the Administrator's decision than has been made here."

24. On the other hand the Court recognizes that the Congress has also emphasized the urgency of completing the national interstate highway system, and has declared it to be in the national interest to accelerate construction of highways within the system. The recent Congressional declaration of intent is contained in the Federal Highway Statute, Title 23, Section 101, amended as recently as December 31, 1970, which provides in part:

"(b) It is hereby declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense.

"It is hereby declared that the prompt and early completion of the National System of Interstate and Defense Highways, so named because of its primary importance to the national defense and hereafter referred to as the 'Interstate System', is essential to the national interest and is one of the most important objectives of this act . . ."