**DETROIT AUDUBON SOCIETY, a Michigan Non–Profit Corporation, North Cass Community Union, a Michigan Non–Profit Corporation, Sierra Club, a California Non–Profit Corporation and Environmental Defense Fund, Inc., a New York Non–Profit Corporation, Plaintiffs,**

v.

**CITY OF DETROIT, a Michigan Municipal Corporation, and Greater Detroit Resource Recovery Authority, Inc., a Michigan Public Corporation, and Combustion Engineering Co., Defendants.**

**HER MAJESTY THE QUEEN IN RIGHT OF the PROVINCE OF ONTARIO; Ian G. Scott, Attorney General for Ontario, and James Bradley, Minister of the Environment of the Province of Ontario, Plaintiffs,**

v.

**GREATER DETROIT RESOURCE RECOVERY AUTHORITY, and Combustion Engineering, Inc., a Delaware Corporation, Jointly and Severally, Defendants.**

Nos. 87–CV–71577–DT, 87–CV–71578–DT.

United States District Court, E.D. Michigan, S.D.

Feb. 24, 1988.

Mark A. Richardson, Detroit, Mich., for Detroit Audubon Soc., North Cass Community Union and Sierra Club.

Michael Herz, New York City, for Environmental Defense Fund.

Donald Pailen, City of Detroit Corporate Counsel, Detroit, Mich., for City of Detroit.

Donnelly W. Hadden, Detroit, Mich. and Jeffrey K. Haynes, Vanderkloot & Haynes, P.C., Bloomfield Hills, Mich., for Province of Ontario.

John D. Pirich, Miller, Canfield, Paddock and Stone, Lansing, Mich., for Greater Detroit Resource Recovery Aurity, Combustion Engineering, Inc.

Stanley M. Gorinson, Joseph Cannon, Kevin Sullivan, Steven Christiansen, Washington, D.C., for Combustion Eng.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND JUDICIAL NOTICE OF 86–CV–72910–DT

HACKETT, District Judge.

Defendants filed a Motion for Summary Judgment pursuant to F.R.Civ.P. 56(c) and Suggestion of Judicial Notice in each of the above cases. Because these cases involve common issues and many of the pleadings filed are substantially similar, the two cases will be consolidated for purpose of the above motions only.

Plaintiffs in the first action (87–CV–71577–DT) are four non-profit organizations concerned with the environment. Plaintiffs in the second action (87–CV–71578–DT) are the Canadian Province of Ontario, the Attorney General for Ontario, and the Minister of the Environment for Ontario. Defendants in both actions are the Greater Detroit Resource Recovery Au-

thority (GDRRA),* a municipal corporation which has as its sole purpose construction of a municipal solid waste combustion facility in Detroit, Combustion Engineering Company (C–E), the construction company retained to build that facility, and the City of Detroit.

On April 15, 1987, the four environmental organizations filed suit in Wayne County Circuit Court seeking

> relief from pollution or impairment of the air, the water, and other natural resources of the State of Michigan threatened by the GDRRF [Greater Detroit Resource Recovery Facility]. Plaintiffs request this Court to enjoin defendants from constructing the incinerator as planned; to require defendant City of Detroit to consider alternatives to the construction of the incinerator; and to grant other equitable and declarative relief.

The environmental groups filed this lawsuit under the Michigan Environmental Protection Act (MEPA), M.C.L. 691.1201 *et seq.* and allege two causes of action in their complaint. In Count I plaintiffs allege that when completed the Detroit incinerator will be one of the largest municipal incinerators in the world and will have the capacity to process approximately 4,000 tons of residential and commercial waste (RDF) per day. Municipal solid waste delivered to the incinerator will be processed into fuel and burned in three boilers. Steam generated by burning the RDF will be sold to Detroit Edison Company and will be used to power the facility. The environmental organizations allege that process and ash residue will be disposed of in a municipal landfill. They further argue that the incinerator will emit vast amounts of pollution into the atmosphere. These emissions will consist of both particulate and gaseous matter and will include at least 50 separate known pollutants including dioxins, furans, mercury (particulates) and sulfer dioxide, hydrogen choloride, hydrogen floride and nitrogen dioxide (gases).

Pursuant to the permit issued, defendants will attempt to control particulate emissions with devices called electrostatic precipitators which plaintiffs allege are not as effective as other available pollution control devices such as baghouses and scrubbers. Plaintiffs allege that defendants have violated their statutory duty to prevent or minimize environmental degradation by planning and constructing the incinerator without adequate air pollution control equipment, without adequate plans to dispose of incinerator ash and process residue, and without any plan for reducing pollution-causing waste through separation and recycling. Relying on this count in their complaint, plaintiffs seek (1) a finding by this court that the facility will or is likely to cause pollution and, (2) to enjoin construction of the facility.

In Count II of the complaint, the environmental organizations allege that defendants had a duty to consider and determine the likely environmental effects of the proposed incinerator and to consider alternatives to construction of the incinerator. Again, defendants seek to enjoin construction of the facility. Plaintiffs allege that this duty also arises under MEPA.

The Ontario plaintiffs' complaint, originally filed in Wayne County Circuit Court, also relies on the Michigan Environmental Protection Act. The Ontario complaint alleges that the incinerator as proposed will or is likely to pollute, impair, or destroy the air, water, and other natural resources of the State of Michigan and of the Province

---

* For convenience of the reader:
  CAA—Clean Air Act
  MEPA—Michigan Environmental Protection Act
  EPA
  or
  USEPA—United States Environmental Protection Agency
  MDNR—Michigan Department of Natural Resources
  AQD—Air Quality Division of the Michigan Department of Natural Resources

  MAPCC—Michigan Air Pollution Control Commission
  GDRRA—Greater Detroit Resource Recovery Authority
  GDRRF—Greater Detroit Resource Recovery Facility
  C–E—Combustion Engineering
  BACT—Best Available Control Technology
  RDF—Residential and commercial waste
  PSD—Prevention of Significant Deterioration

of Ontario, and the public trust therein in one or more of the following ways, including, but not limited to:

The incinerator as planned will pollute the common airshed of Michigan and Ontario with particulate matter, heavy metals, acid gases, chlorinated organic compounds and other air pollutants.

The incinerator will not employ adequate or appropriate control technology to reduce these emissions to the lowest achievable emission rate. The appropriate control technology for controlling such emissions is an acid gas scrubber and fabric filter.

Ontario plaintiffs also seek to enjoin construction of the facility or to have this court order the facility to install an acid gas scrubber and fabric filter.

Both complaints were removed to this court by defendants. Plaintiffs sought to remand both actions. This court subsequently denied both motions to remand finding that the plaintiffs' complaints were *artfully pled* in a purposeful attempt to deprive the federal court of jurisdiction and that the issues raised actually are federal matters.

Defendants now move for summary judgment on both complaints. The bases asserted by defendants for summary judgment are that plaintiffs' complaints are not timely; that plaintiffs' complaints are barred by principles of *res judicata* and collateral estoppel; and, that plaintiffs' complaints state no legally cognizable claim. In addition, defendants allege that summary judgment is appropriate against the Ontario plaintiffs because they have no standing to bring this lawsuit.

Defendants also move this court to take judicial notice of civil action 86–CV–72910–DT, a related proceeding heard by this court. For the reasons stated below and on the record following oral argument heard in these matters, defendants' motions are granted.

### *Judicial Notice*

■ Defendants ask this court to take judicial notice of civil action 86–CV–72910–DT, pursuant to F.R.Evid. 201. As it may assist in understanding the sequence of events in this litigation, the court will first address this matter. Defendants cite *Rodic v. Thistledown Racing Club*, 615 F.2d 736, 738 (6th Cir.1980), *cert. denied*, 449 U.S. 996, 101 S.Ct. 535, 66 L.Ed.2d 294 (1980) in support of their motion. The Ontario plaintiffs oppose this court's taking judicial notice of 86–CV–72910–DT. Ontario plaintiffs incorrectly argue that taking judicial notice is the same as *res judicata*, although they do agree that this court can take judicial notice of the fact that a prior lawsuit did occur. They also note that *Rodic, supra,* and *Grenader v. Public Bank*, 417 F.2d 75 (6th Cir.1969), *cert. denied*, 397 U.S. 1065, 90 S.Ct. 1503, 25 L.Ed. 2d 686 (1970), which is cited in *Rodic*, hold that federal courts may take judicial notice of proceedings in other courts of record but argue that in both cases the court took judicial notice of proceedings in a prior state action between the same parties.

However, other cases hold that a court can take judicial notice of a related proceeding even if not all parties are identical. *See United States v. Author Services, Inc.*, 804 F.2d 1520 (9th Cir.1986); *MacMillan Bloedel Ltd. v. Flintkote Co.*, 760 F.2d 580 (5th Cir.1985); *see also, Green v. Warden, U.S. Penitentiary*, 699 F.2d 364 (7th Cir. 1983), *cert. denied*, 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983), which held that federal courts may take judicial notice of proceedings in other courts, both within and outside a federal judicial system, if the proceedings have a direct relation to matters at issue.

The facts underlying these lawsuits did not recently come into being nor do they exist in a vacuum. This court cannot close its eyes and ignore all of the prior proceedings regarding this trash incinerator. This court will take judicial notice of civil action 86–CV–72910–DT in which this court determined that based on the record at that time, the defendants were acting pursuant to a validly issued permit. As of this date, the validity of that permit has not been further challenged.

## Standing

Defendants argue that the Ontario plaintiffs lack standing to bring the present lawsuit. Defendants refer the court to Article III of the United States Constitution which requires that a plaintiff seeking to invoke this court's jurisdiction must demonstrate "injury in fact" and demonstrate that the injury is within the "zone of interests" protected by the statute. Thus, defendants aver, plaintiff must first "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). In addition, plaintiffs must show that plaintiffs' demonstrated injury is within the zone of interest intended by the scope of the statute. *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

Admittedly Ontario shares both air and water with Michigan, especially with Wayne County. However, potential injury to its air and water is not covered in the MEPA legislation which addresses threats only to Michigan's natural resources in which Ontario, a foreign government, has no recoverable interest or claim. This court must find that the Ontario plaintiffs do not have standing to challenge the alleged degradation of Michigan's resources under MEPA. Because the Ontario plaintiffs adamantly insist that their suit is brought exclusively under MEPA, this court will not consider whether other redress can be sought by the Ontario plaintiffs.

## Timeliness

Defendants allege that plaintiffs' lawsuit is not timely and is barred by the equitable doctrine of laches. The doctrine of laches applies if: (1) the plaintiff(s) delay filing suit; (2) the delay results in prejudice or harm to the defendant(s), and (3) the delay is not excusable. *State of Michigan v. City of Allen Park,* 501 F.Supp. 1007, 1016–17 (E.D.Mich.1980), *aff'd* 667 F.2d 1028 (6th Cir.1981), *cert. denied* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 443 (1982).

Defendants assert that the present action is factually similar to *Clark v. Volpe,* 342 F.Supp. 1324 (E.D.La.1972), *aff'd* 461 F.2d 1266 (1972). *Volpe* involved an action by park users to delay and ultimately enjoin construction of a highway through a city park in New Orleans. Plaintiff park users brought suit alleging that defendants had failed to comply with provisions of five federal statutes and that therefore construction of the park was illegal. Defendants moved to dismiss the lawsuit on the basis of laches. The court in *Volpe* cited *Sobosle v. United States Steel Corp.,* 359 F.2d 7 (3rd Cir.1966) for the proposition that "(l)aches is determined in light of all the existing circumstances and requires that the delay be unreasonable and cause prejudice to the adversary." *Volpe* at 1327. The *Volpe* court then held that lawsuit to be barred by laches stating as follows:

> It is the considered opinion of this court that, in light of the circumstances summarized above, laches should properly apply in the present action. The Court is convinced that for a period of many years prior to the commencement of construction of Highway I–610 through City Park, plaintiffs and members of the class which they claim to represent are charged with knowledge that a highway was to be built through the park.

> \*　　\*　　\*　　\*　　\*　　\*

> Plaintiffs were, of course, entitled to rely on a presumption that public officials would act in accordance with the statutes cited and administer those statutes properly.... Plaintiff's [further] claim that it was not until May 25, 1971, that they were on notice that approval was given without regard to requirements of the statutes, and that it was not until that date that they had reason to suspect non-compliance....

> Nevertheless, plaintiffs stood idly by during the remaining months as bulldozers and chain saws stripped and leveled the land and as vast sums of public money were expended on highway construction. Finally, after the area had been laid barren of trees or grass, and after

several million dollars had been spent for highway development, plaintiffs, on February 24, 1972, belatedly filed suit to halt construction. The Court holds that, under the circumstances of the particular case, plaintiffs' delay in filing suit, during which delay the very acts of which they complain were being performed, was unreasonable, and defendants and intervenors would be substantially prejudiced if plaintiffs were allowed injunctive relief.

*Volpe* at 1328–29.

Like the plaintiffs in *Volpe,* the present plaintiffs did not file this lawsuit immediately after learning of the complained events. The record supports the following important facts. Planning for the incinerator began in 1976 although it was not until 1983 that defendants applied for a permit to construct the project. While considering defendants' application, the Air Quality Division (AQD) of the Michigan Department of Natural Resources (MDNR) made four written requests for additional information regarding the facility with which defendants complied. Prior to approving the construction permit, the State of Michigan provided a thirty-day period for public comment from September 14, 1984, through October 15, 1984, and provided a public hearing on October 16, 1984. Plaintiffs admitted during oral argument that they [or their representative(s)] testified at that hearing. *After a comprehensive review, which included the feasibility of using lime spray dry scrubbers and an analysis of the regional airshed,* the permit was granted by the MDNR pursuant to a delegation of authority by the United States Environmental Protection Agency (EPA). To finance construction of the facility, the GDRRA then issued bonds amounting to almost one-half a billion dollars. Closing of the permanent financing did not occur until May 7, 1986, through the breaking of escrow for the proceeds of the initial bonds and remarketing to the public of permanent bonds in the amount of $438,000,000.

During April 23–25, 1985, the EPA conducted an audit of MDNR's new source review program. The EPA auditors' report stated:

The MDNR is commended for the continuing dedication of its staff to the task of making and documenting complete reviews of new source applications. As has been reported in earlier audits, the Staff Activity Reports which are on file for all sources submitted for review by the Michigan Air Pollution Control Commission (MAPCC) are noteworthy efforts to document all factors considered in reviews of such applications. This audit revealed no real departures from observance of and adherence to continuing good practices.

In addition to the general audit of MDNR's procedure, the EPA also audited five permits, one of which was the permit issued to GDRRA. After a review of the air quality analyses performed to support the permits, the EPA concluded that "MDNR continues to competently perform the air quality analyses required by the regulations, and a general impression obtained from the audit is that there has been an increase in State activity in performing independent internal reviews of modeling analyses contained in permit applications." The EPA auditors did note, however, that in some instances, as in the case of the GDRRA facility, the MDNR had substituted existing data without a showing it was "representative."

On December 18, 1985, Gerald Avery, supervisor of the permit section of the Air Quality Division (AQD) of the MDNR, sent a letter to C–E and to the City of Detroit on the letterhead of Ronald A. Skoog, director of the AQD of the MDNR, which stated:

The letter of 18 December 1985 from the Department of Natural Resources technical staff was intended to inform you of our discovery of information which indicates that technology other than that approved in your Permit No. 468–83 may better control emission levels from resource recovery facilities. This does not imply that the proposed Detroit facility is unsafe. *To the extent that this letter implied that we would request the Commission to modify Permit No. 468–83 to change the air pollution technology re-*

quired, I regret the confusion this has caused. We recognize that your permit cannot be revised solely because of our finding that a new best available control technology should apply to future waste facilities. Given these facts, the DNR does not intend to pursue the issue of permit modification further. (Emphasis ours.)

Although the MDNR, through Ronald Skoog, recognized that lime scrubbers were best available control technology (BACT) for future waste facilities only, a public meeting was held on April 9, 1986, called by the Michigan Air Pollution Commission to discuss the facility. The EPA sent written testimony which was read into the record of the meeting. The testimony was that of Joseph Paisle, Chief of the Technical Analysis Section in the Air Management Division of EPA, Region V. Paisle's testimony stated that a review had been conducted by the EPA of the Resource Recovery Facility which "identified several deficiencies in the construction permit." In regard to the facility's sulfur dioxide emissions, Paisle testified:

> It is USEPA's determination that the BACT analysis conducted for this facility was not adequate to meet the requirements of the Clean Air Act. Specifically, the analysis contained only a cursory review of the control technology alternatives rather than the detailed analysis of alternatives required by the Clean Air Act and the PSD regulations. The sulfur dioxide emission limit contained in the permit is therefore unsubstantiated and the permit itself is therefore deficient in this regard.

Representatives of the present plaintiffs also testified at that meeting. At the close of the April 9, 1986, meeting, which lasted nine hours according to testimony during oral argument on the present motion, the State authorities determined by a vote of 9–1 that there was no basis for the commencement of a proceeding to reconsider the permit.

C–E responded to the EPA written testimony received at the April 9, 1986, meeting by letter dated April 18, 1986. Additional-ly, on April 23, 1986, Bella I. Marshall, chairperson of GDRRA, wrote defendant Valdus Adamkus, Administrator of EPA, Region V, expressing her concern that the actions of the MDNR raised questions as to the permit's status at a time when the mandatory redemption period of the bonds financing the facility was imminent. Marshall requested a prompt resolution of the issue so as not to interfere with the redemption of the bonds. Meetings were held to resolve the dispute but no formal response was made by the EPA.

On May 8, 1986, the Audubon Society, the Environmental Defense Fund, the Sierra Club and the North Cass Community Union (environmental groups) sent a letter to the EPA indicating their intent to initiate suit against the EPA pursuant to Section 304(b) of the Clean Air Act (CAA), 42 U.S.C. § 7604(b) and 40 CFR Part 54 for EPA's failure to enforce the CAA's standards for new facilities. The community groups included a memorandum indicating specific concerns. A copy of this memorandum has never been provided to this court.

On or before May 9, 1986, construction of the GDRRF began.

On May 20, 1986, EPA sent a letter to the GDRRA and to the chief of the AQD of MDNR which stated that "[b]ecause of technical and procedural questions" the EPA thereby revoked the PSD delegation only with respect to the GDRRF pursuant to Section Eight of the delegation agreement. The EPA indicated that a copy of the partial delegation revocation would soon appear in the Federal Register along with the proposed permit revocation. No such publication was ever made.

On July 7, 1986, defendants initiated civil action 86–CV–72910–DT seeking a declaration from this court that the EPA had exceeded its authority in attempting to revoke the GDRRA permit and to enjoin the EPA from any further attempt to revoke the facility's permit. The present plaintiffs attempted to intervene in that lawsuit. However, because that action involved the limited question of whether the EPA possessed the inherent authority to revoke the validly issued permit in that fact situation,

intervention was denied. The environmental organizations then filed an amicus brief on the issue of whether lime scrubbers were BACT under the CAA.

In its Memorandum Opinion and Order dated October 21, 1986, this court granted GDRRA's motion for summary judgment finding that the EPA did not possess the inherent authority in the fact situation before the court to revoke the validly issued permit. Further, this court enjoined the EPA from attempting to revoke GDRRA's permit on the basis of any information then known or available. No appeal was taken from that decision.

Approximately six months later plaintiffs filed this lawsuit. At the present time the facility is in excess of 70% completed; it is expected to be fully completed late this summer or early this fall; more than $438,-000,000 in municipal bonds have been issued; and, $85,000,000 has already been expended.

Plaintiffs argue that their complaint is timely because they do not allege that the federal permit is defective, but that the environmental damage the incinerator will cause when operational is unacceptable. Plaintiffs state that the facility will begin operation more than two years after their complaint was filed, and, if anything, their complaint may be too early. They further allege that their delay, if any, was not unreasonable. Plaintiffs claim that they waited for an outcome in civil action 87–CV–72910–DT before initiating this lawsuit. Plaintiffs claim that the six months interim time prior to filing this lawsuit was spent raising money for legal fees.

■ After careful consideration this court must find that laches does apply to plaintiffs' claims seeking to enjoin construction of the facility or to require a different technology (baghouse—scrubbers). Public hearings were held during which the feasibility of using scrubbers was investigated and considered and periods for public comment were provided *prior* to issuing the construction permit.

The Staff Activity Report that preceded issuance of the permit and which is a part of the record in this case states:

An analysis was made to determine the feasibility of lime dry gas scrubbing to control emissions of $SO_2$. The results of this analysis predicted that the cost to install, operate and maintain these lime spray dryer scrubbers would result in a mandatory increase in the MSW truck tipping fees in excess of 40 percent higher than the originally projected tipping fees. *Such an increase in the pass-through cost for the MSW disposal service would render the project non-competitive and therefore non-profitable, or [not] economically feasible at this time.* However, the applicant has agreed to provide space to accommodate the possible future installation of lime spray drier [sic] scrubbers, should it become feasible and necessary in the future to reduce acid gas emissions such as $SO_2$ and particularly hydrogen chloride.

MDNR Staff Activity Report at 5–6, October 16, 1984 (emphasis added).

Again, this facility is more than 70% completed and millions of dollars have been spent. Clearly, plaintiffs have delayed filing suit and this delay is prohibitively prejudicial to defendants which have complied with all permit requirements. In response to an inquiry by the court, plaintiffs stated that all additional costs, anticipated to amount to many millions of dollars, should be borne by defendants notwithstanding the terms of their contracts!

*Collateral Estoppel and Res Judicata*

Defendants move for summary judgment on the basis of collateral estoppel "issue preclusion" and *res judicata* "claim preclusion". Collateral estoppel would bar a suit challenging the validity of the permit granted to the incinerator. However, plaintiffs repeatedly insist that they do not challenge the validity of the permit (which was found to be valid in 86–CV–72910–DT) but argue that other technology can be required under MEPA. This was not addressed in the prior case.

This court also finds no merit in defendants' argument that the present plaintiffs are in privity with the EPA and are there-

fore barred from bringing this lawsuit by *res judicata.* As plaintiffs point out, they tried to intervene in the prior lawsuit but were denied that opportunity by this court because the issues they sought to litigate were not before the court. This court cannot now hold that they are barred from bringing this lawsuit which alleges previously unlitigated issues.

### Legal Sufficiency of Plaintiffs' Claim

Defendants' final argument for summary judgment is that plaintiffs have failed to set out a legally cognizable claim under either federal law or MEPA. Under Section 304 of the Clean Air Act (CAA), 42 U.S.C. § 7604, a citizen can bring a lawsuit in district court against a person or entity who constructs or proposes to construct a major emitting facility without a permit or against a person who is alleged to be in violation of an emission limitation. Plaintiffs have failed to allege that defendants will exceed any emissions limitations.

A brief history of the 1970 Clean Air Act Amendments as contained in 37 ALR Fed 320 explains the development of this area of the law and helps to explain the role and responsibilities of the parties now before the court.

> In considering the background and history of the Clean Air Amendments of 1970, it may be remembered that, in its initial response to the growing problem of air pollution, Congress had begun by merely offering encouragement and assistance to the individual states. Thus, in 1955 the Surgeon General of the United States had been authorized to study the problem of air pollution, to support research, training, and demonstration projects, and to provide technical assistance to state and local governments attempting to abate pollution (69 Stat 322). In 1960, Congress had directed the Surgeon General to focus his attention on the health hazards resulting from motor vehicle emissions (Pub L 86–493, 74 Stat 162). The Clean Air Act of 1963 had authorized federal authorities to expand their research efforts, to make grants to state air pollution control agencies, and to intervene directly to abate interstate pollution in limited circumstances (77 Stat 392). Amendments in 1965 (79 Stat 992) and in 1966 (80 Stat 954) had broadened federal authority to control motor vehicle emissions and to make grants to state pollution control agencies. The focus shifted somewhat in the Air Quality Act of 1967. The provision reiterated the premise of the existing legislation that the prevention and control of air pollution at its source was properly the primary responsibility of states and local governments. And though federal authorities were given certain powers of supervision and enforcement, the states nonetheless retained wide latitude in determining the air quality standards they would meet and the period of time in which they would meet them (81 Stat 485). The response of individual states to the above-mentioned manifestations of increasing congressional concern with air pollution proved to be "disappointing," as was observed in a leading case (*Train v. Natural Resources Defense Council, Inc.* (1975) 421 US 60, 43 L Ed 2d 731, 95 S Ct 1470) and state planning and implementation under the Air Quality Act of 1967 continued to make little progress. Accordingly, Congress reacted by "taking a stick" to the states (see *Train v Natural Resources Defense Council,* supra) in the form of legislation entitled Clean Air Amendments of 1970 (Pub L 91–604, 84 Stat 1676).
>
> The 1970 amendments greatly increased federal authority and responsibility in the continuing effort to combat air pollution. Air quality standards of two general types were to be drawn up by the EPA: primary standards which, in the judgment of the agency, were required to protect the public health (42 USCS § 1857c–4(b)(1)); and secondary standards, those which, in the judgment of the EPA, were necessary to protect the public welfare from any known or anticipated adverse effects connected with the presence of such air pollutant in the ambient air (42 USCS § 1857c–4(b)(2)). At the same time, the statute explicitly preserved the principle

that each state should have the primary responsibility for assuring air quality within its entire geographic area (42 USCS § 1857c–2(a)).

On the other hand, individual states were no longer given any choice as to whether they would meet their responsibility; for the first time, they were *required* to attain air quality of specified standards and to do so within a specified period of time, to wit, "as expeditiously as practicable," but in no event later than three years from the date of approval of the state plan by the EPA (42 USCS § 1857c–5(a)(2)(A)). *The fundamental statutory scheme is that of federal preemption,* followed by federal standards regulating permissible air emissions, and delegation of the emission permit and monitoring mechanism back to the states; each state, in turn, is required to enact regulatory legislation conforming to the federal guidelines. (Emphasis added.)

Plaintiffs however insist that their action is not under the CAA, but under MEPA. They correctly argue that the CAA allows a state to enforce stricter standards than those provided by the federal government. Plaintiffs argue that the vague provisions of MEPA allow these stricter standards to be set by a court rather than the legislature and that this will in no way affect the permit that has been granted. A careful review of the legislation and facts in this case does not support this argument.

To establish a prima facie case under MEPA, a plaintiff must establish that the conduct of the defendant has, or is likely to, pollute, impair, or destroy the air, water or other natural resources or the public trust therein. M.C.L. 691.1203(1). The same section provides that as an affirmative defense, a defendant may rebut plaintiffs' prima facie case by showing

that there is no feasible and prudent alternative to defendant's conduct and that such conduct is consistent with the promotion of the public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment or destruction. M.C.L. 691.1203(1).

■ The federal permitting process determined that the facility as proposed was consistent with the public health, safety, and welfare and that there was no *feasible* and prudent alternative (this is in fact what a BACT analysis entails). As the court previously held, this determination is not reviewable after a permit has been issued absent a finding of fraud or misrepresentation. That no fraud or misrepresentation occurred during the permitting process was determined in 86–CV–72910–DT. Plaintiffs are collaterally estopped to deny this finding.

Thus assuming, arguendo, that plaintiffs were able to establish a *prima facie* case under MEPA, the federal permit creates an unrebuttable presumption that defendants' conduct is consistent with the promotion of the health, safety, and welfare of Michigan citizens and that no feasible and prudent alternatives are available. To hold otherwise would give Michigan courts review over federal permitting procedures. As counsel for plaintiffs stated during oral argument, "the system would be in disarray if we relied on citizens suing under MEPA to set the standards" for what constitutes pollution. Yet this is, in essence, what plaintiffs argue MEPA allows.

The court adopts defendants' argument addressing this court's authority under MEPA to change air emissions standards and/or to shut down the trash incinerator.

First, plaintiffs assert that "MEPA … empowers this court to make a *de novo* finding concerning … air pollution emitted from this incinerator" apparently based on the language of MEPA stating it is, "supplementary to *existing* administrative and regulatory procedures provided by law" (Plaintiffs' Response at 3; MCL 691.1206) (emphasis added). The central flaw in plaintiffs' argument is that the specific standards incorporated within defendants' federal permit did not "exist" when the MEPA was enacted, in 1970. An amendment to the Air Pollution Act enacted in 1972 (two years *after* the passage of the MEPA), however, ex-

panded the authority of the Air Pollution Control Commission of the Michigan Department of Natural Resources, and specifically directed the Commission to establish standards for air quality and emissions and to issue regulatory permits. The Legislature's *express* grant of authority to the Commission, coupled with the Commission's exercise of that authority, on behalf of both Michigan and the United States, in issuing a permit for the Project, plainly supersedes any judicial authority granted by the MEPA.[12]

It is a long-established "principle of statutory construction that [a] later and more specific amendment takes precedence over an earlier and more general provision" *Malone v. Michigan Employment Security Commission*, 352 Mich. 472, 480, 90 N.W.2d 468 (1958). "A specific statute prevails over a general statute dealing with the same subject" *Hisaw v. Hayes*, 133 Mich.App. 639, 645, 350 N.W.2d 302 (1984). As such, inasmuch as the Michigan Legislature has endorsed the air pollution regulations promulgated by the Air Pollution Control Commission, those specific standards supersede the general "standards" set forth in the MEPA.

---

[12] Even the architect of MEPA, Joseph Sax, recognizes preemption by subsequent and more specific environmental legislation. In an article published in the the *Michigan Law Review,* Sax makes the following comments:

To the extent that judges may in future cases find conflict between the [M]EPA and explicit, detailed provisions in other germane statutes, they must, of course, apply the usual standards of statutory construction for bringing diverse legislative pronouncements into harmony. *When the legislature has incorporated an exacting or quantitative standard into a law subsequent to the [M]EPA, the courts should ordinarily view that standard as governing"* (emphasis added).

J. Sax, "Michigan's Environmental Protection Act of 1970: A Progress Report," 70 Mich.L. Rev. 1003, 1064 (1977).

Defendants' Reply Memorandum in Support of Motion for Summary Judgment, 87–CV–71578–DT, November 6, 1987.

Further, although plaintiffs are dissatisfied with the determinations of the EPA and the AQD of the MDNR, MEPA relief is not available. Both the federal and state authorities continue to be actively involved in this trash incinerator project. They are monitoring its progress and overseeing its compliance with the authority granted for its construction. An extensive permitting process has brought it to this stage.

The United States Supreme Court recently discussed the role of citizen suits in a case involving provisions of the Clean Water Act. As explained by the court, citizen suits are intended to supplement, not supplant, governmental action. *Gwaltney of Smithfield, Ltd., v. Chesapeake Bay Foundation, Inc.,* —— U.S. ——, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

In all of the cases reviewed by this court, defendant is alleged to have failed to comply with specific standards or requirements. "Alleged to be in violation" language is key in these matters. To-date, no one argues that defendants in this case have failed to do what is required of them pursuant to their unchallenged valid construction permit.

As stated in *Gwaltney, supra,*

Moreover, both the Senate and House Reports explicitly connected § 505 to the citizen suit provisions authorized by the Clean Air Act, which are wholly injunctive in nature. See S.Rep. No. 92–414, *supra,* at 79, 2 Leg.Hist. 1497 (Citizen participation under the Clean Water Act is "modeled on the provision, enacted in the Clean Air Amendments of 1970"); H.R.Rep. No. 92–911, *supra,* at 133, 2 Leg.Hist. 820 ("Section 505 closely follows the concepts utilized in section 304 of the Clean Air Act"). Congress' acknowledgement of this connection suggests that the identity of the "alleged to be in violation" language of the citizen suit provisions of the two Acts is not accidental; rather, the two provisions share the common central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance. This understanding of the "alleged to be in violation" language as a statutory term of art rather than a mere stylistic infelicity is reinforced by the consistent adherence in

the Senate and House Reports to the precise statutory formulation. See, *e.g.*, S.Conf.Rep. No. 92–1236, p. 145 (1972), 1 Leg.Hist. 328; H.R.Rep. No. 92–911, *supra*, at 133, 1 Leg.Hist. 820; S.Rep. No. 92–414, *supra*, at 79, 2 Leg.Hist. 1497.

As explained in *National–Southwire Aluminum Co. v. EPA*, 838 F.2d 835 (6th Cir.1988),

> ... a major purpose of the Clean Air Act [is] to prevent or minimize any increases in existing levels of pollution. This philosophy is embodied in 42 U.S.C. § 7411(b), which authorizes a system of *nationally uniform emission standards* that apply to both newly-constructed sources of pollution and to existing sources that increase their emissions. *ASARCO, Inc. v. EPA*, 578 F.2d 319, 321–22 (D.C.Cir.1978). This purpose was unequivocally expressed by Congress. "The maximum use of available means of preventing and controlling air pollution is essential to the elimination of new pollution problems while cleaning up existing sources." S.Rep. No. 1196, 91st Cong., 2d Sess. at 16, *reprinted in* 1 Senate Committee on Public Works, A Legislative History of the Clean Air Act Amendments of 1970, at 416. "[T]he emission standards shall provide that sources of such emissions shall be designed and equipped to prevent and control such emissions to the fullest extent *compatible with the available technology and economic feasibility*." H.R.Rep. No. 1146, 91st Cong., 2d Sess., at 10, *reprinted in* 1970 U.S.Code Cong. & Admin. News 5356, 5365. (Emphasis added).

However artfully plaintiffs may plead their case, they are asking this court to review federal and state agency decisions and action. The named defendants in the case now before the court can do nothing without agency approval. The permit itself so provides. The statutory scheme gives substantial latitude to the states in setting emissions standards for welfare related pollutants generated by local facilities. As stated in *National–Southwire Aluminum Co. v. EPA, supra:*

Our standard of review is a deferential one that presumes the validity of agency action. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16 [91 S.Ct. 814, 823–24, 28 L.Ed.2d 136] (1971). The EPA determination under review in this case hinges on the interpretation of section 111 of the Clean Air Act and of the EPA's regulations implementing that section. The Supreme Court has established a two-step procedure for judicial review of statutory construction by an administrative agency. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter...." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnote omitted). "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844, 104 S.Ct. at 2782 (footnote omitted).

This court has recognized the mandate of the Supreme Court that " 'great deference' be accorded the 'interpretation given [a] statute by the officers or agency charged with its administration.' " *McCown v. Secretary of HHS*, 796 F.2d 151, 157 (6th Cir.1986) (quoting *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). We have observed that, in reviewing agency action under section 706 of the Administrative Procedure Act, "[w]e are, therefore, normally 'bound by the principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.' " *United States Air Force v. FLRA*, 681 F.2d 466, 467 (6th Cir.1982) (quoting *Miller v. Youakim*, 440 U.S. 125, 145 n. 25, 99 S.Ct. 957, 969 n. 25, 59 L.Ed.2d 194 (1979); *Red*

*Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969)).

In this case, the EPA's interpretation of the Clean Air Act is embodied in its regulations. The Agency's interpretation of its own regulations is entitled to special deference. " 'When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.' " *Compton v. Tennessee Dep't of Public Welfare,* 532 F.2d 561, 565 (6th Cir.1976) (quoting *Udall,* 380 U.S. at 16–17, 85 S.Ct. at 801–02). As this court and the Supreme Court have explained:

> Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."

*Compton,* 532 F.2d at 565 (quoting *Udall,* 380 U.S. at 16–17, 85 S.Ct. at 801–02; *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217–18, 89 L.Ed. 1700 (1945)).

*National–Southwire Aluminum Co. v. EPA,* at 838.

We are reminded in the legislation and many opinions addressing clean air that the regulatory agencies, both federal and state, are concerned with the need for clean air nationally and world-wide. Boundaries become meaningless. Regional airsheds are identified to fix area responsibility, and standards pursuant to a national plan. As the court explained in *International Paper Co. v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987)

> ... the present plaintiffs' air claims are not directly derived from the rights of the state. This is especially true because the concept of "interstate air" has a weaker doctrinal foundation than the concept of "interstate streams" which finds its roots in the line of cases discuss-

ing equitable apportionment of "interstate waters".

The court in *Ouellette* noted that state law claims are still subject to preemption by federal legislation which is consistent with this courts finding in the present fact situation. Again, a federal-state permit is required to build this facility and/or to make changes. See Rule 201 of Supplement to Permit No. 468–83. MEPA and this court cannot give plaintiffs the relief they are seeking.

The exhibits attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment clearly evidence the fact that the AQD of the MAPCC set specific emission standards for each of the many anticipated emissions from this facility which emissions had to be carefully evaluated and balanced.

As explained during oral argument, the addition of other equipment, be it scrubbers, baghouses or whatever, changes emissions quotas and affects the air quality balance sought to be accomplished by the agencies having primary responsibilities in these matters. If each court could substitute its judgment as each matter came before it for that of the governmental agency bearing primary responsibility and having the expertise, results would be disastrous!

In summary, defendants have a valid construction permit. Nothing suggests that they are not in full compliance with its requirements. They will seek a Permit to Operate upon completion of the facility. If they meet all permit requirements, they will be in operation. Failing to do so, they will not.

This court finds, as argued by defendants, that

> [t]his case is remarkably similar to *League to Save Lake Tahoe, Inc. v. Trounday,* 598 F.2d 1164 (9th Cir.1979), *cert. denied,* 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979). In *Trounday* the plaintiffs (individuals and an environmental group) believed the emissions limitations in two PSD permits issued by the State of Nevada were not sufficiently stringent. Consequently, plaintiffs filed

a citizen suit requesting that the Court enjoin further construction of the two facilities (two casino/hotels) for which the permits had been issued. The plaintiffs had received notice of the public hearings held prior to issuance of the two permits, but failed to exercise their right to pursue administrative and judicial appeals of the permits after issuance (598 F.2d at 1174). Subject matter jurisdiction was based on § 304 of the Clean Air Act (42 U.S.C. § 7604) and 28 U.S.C. § 1331 (598 F.2d at 1166). The United States Court of Appeals for the Ninth Circuit concluded it possessed jurisdiction over the case (598 F.2d at 1173). However, the court went on to dismiss the case, stating that in the opinion of the court the case failed to state any claim for relief because any issue as to the sufficiency of the permit conditions (emissions limitations) had been preemptively and conclusively decided in the original federal/state permitting proceedings: "Appellants' challenge to the [permit] ... should have been pursued throught the administrative review procedures set forth as part of the [Nevada SIP] * * * there has been complete compliance with all [procedural] requirements of the [SIP]" (598 F.2d at 1174). The same is true in this case. Plaintiffs' improper attempt to revisit the administrative proceedings concluded in 1984 is squarely at odds with the permitting process created by Congress. Plaintiffs' claim is completely preempted.

Defendants' Supplemental Memorandum In Opposition to Motion to Remand, 87–CV–71577–DT fn. 7.

This court must find that the relief sought by plaintiffs—that this court in effect set aside the permitting process purposefully created by Congress and substitute its judgment for that of the appropriate legislative bodies and regulatory agencies—is not supported by the facts or law in this case.

The separation of powers doctrine lies at the heart of our constitutional form of government. The Framers intended separate and distinct powers in establishing the three branches of government, Legislative, Executive and Judicial, as a safeguard. The doctrine is violated when one branch assumes a function that more properly is entrusted to another or impermissibly interferes with the others' performance of its constitutionally assigned function.

For the above reasons, IT IS ORDERED that Defendants' Motions for Summary Judgment are granted.